No. 23-10284

In the

# United States Court of Appeals

For the Fifth Circuit

_____

Adis Kovac; Bashar Aljame; Abraham Sbyti;
Suhaib Allababidi; Fadumo Warsame,

*Plaintiffs-Appellants*

v.

Christopher Wray, Director Of The Federal Bureau Of Investigation,
In His Official Capacity; Charles H. Kable, Director Of The Terrorist
Screening Center; In His Official Capacity; Deborah Moore, Director,
Transportation Security Redress (OTSR); In Her Official Capacity;
Nicholas Rasmussen, Director Of The National Counterterrorism
Center, In His Official Capacity; David P. Pekoske, Administrator
Transportation Security Administration (TSA); In His Official
Capacity; Kevin K. Mcaleenan, Acting Commissioner United States
Customs And Border Protection; In His Official Capacity,.,

*Defendants-Appellees.*

_____

Appeal from the United States District Court
for the Northern District of Texas

_____

## OPENING BRIEF OF PLAINTIFFS-APPELLANTS

June 21, 2023

Lena F. Masri
Gadeir I. Abbas*
Justin Sadowsky
Hannah Mullen
CAIR LEGAL DEFENSE FUND
453 New Jersey Ave. SE
Washington, DC 20003
(202) 742-6420
*Counsel for Plaintiffs-Appellants*

*Gadeir I. Abbas licensed to
practice in Virginia only. Practice
limited to federal matters.*

No. 23-10284

ADIS KOVAC, ET AL.,

Plaintiffs-Appellants,

v.

CHRISTOPHER WRAY, ET AL.,

Defendants-Appellees.

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel certifies that the following listed persons and entities, as described in the fourth sentence of Rule 28.2.1, have an interest in the outcome of this case. These representations are made so that the judges of this Court may evaluate possible disqualification or recusal.

Plaintiffs-Appellants

Adis Kovac

Bashar Al-Jame

Suhai Allababidi

Abraham Sbyti

Faduma Mohamed Warsame

Defendants-Appellees

      Christopher Wray

      Charles H. Kable

      Deborah Moore

      Nicholas J. Rasmussen

      David P. Pekoske

      Kevin K. McAleenan

CAIR Legal Defense Fund

      Lena F. Masri

      Gadeir I. Abbas

      Justin Sadowsky

      Hannah Mullen

United States Department of Justice

      Christopher Robert Healy

      Joshua Paul Waldman

      Sharon Swingle

June 21, 2023                /s/ Lena F. Masri
                               Lena F. Masri

                               *Counsel for Plaintiffs-Appellants*

## STATEMENT REGARDING ORAL ARGUMENT

The major questions doctrine demands a comprehensive examination of the history, breadth, and significance of the powers asserted by a federal agency. Where those powers are unusually expansive, a court will find them authorized by statute only where Congress clearly meant to confer them upon the agency. *See West Virginia v. EPA*, 142 S. Ct. 2587, 2608 (2022). This appeal presents the novel question of how to apply the major questions doctrine to the federal Government's terror watchlist.

Plaintiffs-Appellants request oral argument so that the parties will have the opportunity to assist the Court in the statutory and factual analysis required to resolve the appeal.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ..........................................ii

STATEMENT REGARDING ORAL ARGUMENT ...................................iv

TABLE OF CONTENTS................................................................... v

TABLE OF AUTHORITIES ............................................................vii

INTRODUCTION .......................................................................... 1

JURISDICTIONAL STATEMENT .......................................................3

ISSUE PRESENTED........................................................................3

STATEMENT OF THE CASE..............................................................3

   I. The federal Government claims the power to place an unlimited number of United States citizens on a secret watchlist that affects nearly every aspect of their lives............................................................3

      A. Executive Order HSPD-6 created the federal watchlist without specific congressional authorization ...................................................3

      B. Individuals may be placed on the watchlist without being investigated, indicted, or convicted of any terrorism-related offense 6

      C. Individuals placed on the watchlist suffer far-reaching consequences without any meaningful way to seek removal from the list 9

   II. Plaintiffs are law-abiding American citizens caught up in the watchlist's web ........................................................................ 12

   III. The district court granted summary judgment for the Government 22

SUMMARY OF ARGUMENT .............................................................24

STANDARD OF REVIEW ................................................................26

ARGUMENT ...............................................................................26

   I. The terrorist watchlist has never been authorized by Congress and is in excess of the relevant agencies' statutory authority ........................26

      A. The major questions doctrine applies because the watchlist is an extraordinary assertion of federal agency power............................27

1. The district court correctly held that the watchlist poses a major question. ...........................................................................27

2. The Government's arguments to the contrary are unconvincing. ...................................................................................30

B. Congress has not clearly authorized federal agencies to create and maintain the watchlist ...................................................... 33

1. The FBI is not clearly authorized to create, maintain, or use the watchlist ........................................................................ 34

2. DHS is not clearly authorized to create, maintain, or use the watchlist ........................................................................ 36

3. CBP is not clearly authorized to create, maintain, or use the watchlist ........................................................................ 37

4. TSA is not clearly authorized to create, maintain, or use the watchlist ........................................................................ 38

5. None of the district court's other arguments overcome the utter lack of clear statutory authorization ........................................... 45

CONCLUSION ......................................................................... 48

# TABLE OF AUTHORITIES

**Cases**

*Ala. Ass'n of Realtors v. Dep't of Health and Human Servs.*, 141 S. Ct. 2485 (2021) .................................................................. 31, 33, 40, 47

*Badgerow v. REJ Props., Inc.*, 974 F.3d 610 (5th Cir. 2020) ................... 26

*Brown v. U.S. Dep't of Educ.*, No. 4:22-cv-0908, 2022 WL 1685825 (N.D. Tex. Nov. 10, 2022) ........................................................................ 37

*BST Holdings, LLC v. OSHA*, 17 F.4th 604 (5th Cir. 2021) ............. 28, 31

*Elhady v. Kable*, 391 F. Supp. 3d 562 (E.D. Va. 2019) ............... 10, 11, 29

*Elhady v. Kable*, 993 F.3d 208 (4th Cir. 2021) ................................. 10, 29

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) ... 27, 40

*In re MCP No. 165*, 20 F.4th 264 (6th Cir. 2021) ................... 28, 31, 33, 48

*Midship Pipeline Co., LLC v. FERC*, 45 F.4th 867 (5th Cir. 2022) ......... 26

*Mohamed v. Holder*, No. 1:11-cv-50 (E.D. Va. Jan. 17, 2018) ............. 7, 28

*Murphy v. NCAA*, 138 S. Ct. 1461 (2018) ................................................ 44

*New York v. United States*, 505 U.S. 144 (1992) ..................................... 44

*NFIB v. OSHA*, 142 S. Ct. 661 (2022) ................... 2, 27, 31, 32, 34, 44, 46

*United States Telecom. Ass'n v. FCC*, 855 F.3d 381 (D.C. Cir. 2017) ..... 34

*Utility Air Reg. Grp. v. EPA*, 573 U.S. 302 (2014) ....................... 27, 33, 40

*Wagafe v. Trump*, No. C17-0094-RAJ, 2017 WL 2671254 (W.D. Va. June 21, 2017) ...................................................................................... 11, 29

*West Virginia v. EPA*, 142 S. Ct. 2587 (2022) 26, 27, 30, 33, 36, 37, 40, 42

**Statutes**

10 U.S.C. § 2801 ........................................................................................ 9

18 U.S.C. § 2331 ..................................................................................... 8, 9

19 U.S.C. § 482 ........................................................................................ 38

28 U.S.C. § 1291 ........................................................................................ 3

28 U.S.C. § 1331 ........................................................................................ 3

28 U.S.C. § 533 ................................................................ 2, 35, 45

49 U.S.C. § 114 ................................................................ 40, 41, 42

49 U.S.C. § 44903 ................................................................. 39, 43

49 U.S.C. § 44904 ..................................................................... 42

5 U.S.C. § 706(2)(C) .................................................................. 22

6 U.S.C. § 111 ................................................................... 36, 45

6 U.S.C. § 114 ......................................................................... 45

Aviation and Transportation Security Act of 2001, Pub. L. 107-71, 115
      Stat. 597-600 (Nov. 19, 2001) ........................................... 41

## Other Authorities

E. Gellhorn & P. Verkuil, *Controlling* Chevron *Based Delegations*, 20
      Cardozo L. Rev. 989, 1011 (1999) ....................................... 37

## Rules

Fed. R. Civ. P. 56(a) ................................................................. 26

## INTRODUCTION

Plaintiffs Adis Kovac, Bashar Al-Jame, Suhai Allababidi, Abraham Sbyti, and Faduma Mohamed Warsame are U.S. citizens who have never been charged, indicted, or convicted of a terrorism-related offense. Nonetheless, they and their families face searches, detentions, and interrogations every time they enter an airport, turning routine travel into a demoralizing hours-long ordeal.

Plaintiffs, along with over one million other people, have been swept up in the federal Government's terror watchlist. The Government claims the power to place an unlimited number of people on that list and, as a result, subject them to extensive security screening, impose adverse immigration consequences on them, and distribute their information to thousands of law-enforcement and private entities, which then use it to affect everyday interactions like traffic stops, municipal permit processes, firearm purchases, and licensing applications.

Separation-of-powers and statutory-interpretation principles demand that the Government justify such an extraordinary claim of power with a comparably clear authorization from Congress. But no federal law has ever instructed federal agencies to create, maintain,

operate, or administer the watchlist. So, in the district court, the Government turned to boilerplate language from enabling legislation and drive-by statutory acknowledgments of the watchlist's existence to try to carry its burden, including pronouncements that:

- the "primary mission" of the Department of Homeland Security includes the duty to "prevent terrorist attacks within the United States" and "reduce the vulnerability of the United States to terrorism," 6 U.S.C. § 111(b)(1)(A), (B);

- the U.S. Customs and Border Protection Office of Field Operations shall "deter and prevent terrorists and terrorist weapons from entering the United States," 6 U.S.C. § 211(g)(3)(A);

- the Attorney General has the power to appoint officials "to detect and prosecute crimes against the United States," 28 U.S.C. § 533(1);

- the Administrator of the Transportation Security Administration shall "develop policies, strategies, and plans for dealing with threats to transportation security," 49 U.S.C. § 114(f)(3).

The Government's cited statutes do not come close to clearly authorizing the watchlist. And "[i]f administrative agencies seek to regulate the daily lives and liberties of Americans," the major questions doctrine demands that "they must at least be able to trace that power to a clear grant of authority from Congress." *NFIB v. OSHA*, 142 S. Ct. 661, 668 (2022) (per curiam) (Gorsuch, J., concurring). No such clear authorization exists. This Court should reverse the district court's grant of summary judgment.

2

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331. Summary judgment was entered against Plaintiffs-Appellants as to all claims and all parties on March 9, 2023. Plaintiffs-Appellants timely filed a notice of appeal on March 22, 2023. This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUE PRESENTED

The issue presented is whether federal agencies' creation, maintenance, and operation of the federal terror watchlist poses a major question that demands clear congressional authorization and, if so, whether such clear congressional authorization exists.

## STATEMENT OF THE CASE

**I. The federal Government claims the power to place an unlimited number of United States citizens on a secret watchlist that affects nearly every aspect of their lives.**

**A. Executive Order HSPD-6 created the federal watchlist without specific congressional authorization.**

Homeland Security Presidential Directive 6 (HSPD-6), an executive order issued in 2003, instructed the Attorney General to "establish an organization to consolidate the Government's approach to terrorism screening and provide for the appropriate and lawful use of Terrorist

3

Information in screening processes." ROA.1528. HSPD-6 relied on agencies' existing statutory authority: It does not identify any particular source of law that authorizes its mandate and states that its terms do "not alter existing authorities or responsibilities of department and agency heads to carry out operational activities or provide or receive information." *Id.*

The resulting organization, the Terrorist Screening Center (TSC), is administered by the Federal Bureau of Investigation (FBI) in coordination with the Department of Homeland Security (DHS), Department of State (State), Department of Justice (DOJ), and the Office of the Director of National Intelligence (ODNI). *See* ROA.1519. That consortium of agencies develops and maintains the federal Government's consolidated Terrorist Screening Dataset (the "watchlist"), which is the federal Government's master repository for suspected international and domestic terrorist records used for watchlist-related screening. *See id.*

Defendant agencies play different roles in that watchlisting scheme. The FBI, as just mentioned, administers the TSC. Several agencies, including DHS and its components, the Transportation Security Administration (TSA) and Customs and Border Protection

(CBP), nominate individuals for inclusion in the watchlist, and those nominations are reviewed by the National Counterterrorism Center (NCTC) and the FBI. *See* ROA.1520. Defendant agencies use watchlist information in their operations, including during "vetting and inspection of travelers seeking entry to the United States or between ports of entry, at preclearance facilities abroad, and during the processing of trusted traveler applications," ROA.1522 (CBP), and in "air passenger screening and transportation security credential vetting," *id.* (TSA). The TSC also shares the watchlist with various "partners," including federal, state, local, and foreign government agencies and officials, who then use that information in their screening, vetting, credentialing, diplomatic, military, intelligence, law enforcement, visa, immigration, and other security functions. *Id.*

The creation of TSC's sweeping, consolidated terror watchlist marked a sharp break with the federal Government's previous watchlisting practices. Before 2003, nine federal agencies maintained twelve separate watchlists "to help secure our nation's borders."[1] The

---

[1] U.S. General Accounting Office, *Information Technology: Terrorist Watch Lists Should Be Consolidated to Promote Better Integration and Sharing*, GAO-03-022,

Government used those lists for four "primary functions," all of which focused on a watchlisted individual's entry into and exit from the United States.[2] As described below (at 9-12), the consequences of being placed on the modern terror watchlist stretch far beyond border-related screening.

### B.     Individuals may be placed on the watchlist without being investigated, indicted, or convicted of any terrorism-related offense.

An individual may be "nominated" to the watchlist by a federal Government agency based on information from law enforcement, immigration records, the homeland security and intelligence communities, and foreign governments. ROA.1520-21, ROA.1826-27. TSC makes the ultimate decision whether a nominated individual meets the minimum requirements for inclusion on the watchlist—specifically, whether it has "reasonable suspicion" that the person is a "known or suspected terrorist." ROA.1520.

According to the Government, reasonable suspicion requires the following:

> articulable intelligence or information which, based on the totality of the circumstances and, taken together with rational

---

Report to Congressional Requesters, at 6-7 (April 2003), https://www.gao.gov/assets/gao-03-322.pdf.

[2] *See id.*

> inferences from those facts, creates a reasonable suspicion that the individual is engaged, has been engaged, or intends to engage, in conduct constituting preparation for, in aid or in furtherance of, or related to, terrorism and/or terrorist activities.

ROA.1521. That definition, on its face, builds in layers of speculation: "Reasonable suspicion" is defined to include "reasonable suspicion" of certain activities. *See Mohamed v. Holder*, No. 1:11-cv-50, Dkt. 70 at 18 (E.D. Va. Jan. 17, 2018) (at ROA.243) ("In other words, an American citizen can find himself listed a suspected terrorist because of a 'reasonable suspicion' based on a 'reasonable suspicion.'"). And the Government may place someone on the list when they "cannot legally be arrested, detained, or otherwise restricted in their movements or conduct" for terrorism-related activities, as there is no requirement that an individual be tried, convicted, indicted, or investigated for criminal activity. *Id.* at 19 (at ROA.244). Listed individuals receive no notice from the Government of their impending placement on the watchlist, nor do they receive any information about why the Government believes that they meet the reasonable-suspicion standard. *See* ROA.1521.

In practice, that vague and easy-to-meet standard sweeps innocent people onto the list and traps them there. All of the Plaintiffs are law-

7

abiding American citizens who have never been arrested, indicted, or convicted of a terrorism-related offense. They are baffled by their inclusion on the watchlist. Mr. Al-Jame, for example, has no idea "what I am accused of" and has volunteered to take a lie detector test to reassure the Government that he harbors no ill intent towards his country's national security. ROA.1962-63. Mr. Allababidi similarly offered to provide the Government with any information it might find helpful in clarifying that he is not a threat: "If there is any way I can help I would be more than happy to do so." ROA.2007. But they remain watchlisted, without explanation, for reasons known only to the Government.

TSC selects a subset of individuals from the consolidated watchlist for inclusion in the No Fly List and Selectee List. Individuals on the No Fly List "are prohibited from boarding flights on U.S. carriers as well as flights into, out of, over or within U.S. airspace," and individuals on the Selectee List "may be subject to additional security screening before being permitted to board an aircraft." ROA.1519. The criteria for inclusion in the No Fly List, which is public, requires the TSC to determine that an individual poses:

1. a threat of committing an act of international terrorism (as defined in 18 U.S.C. § 2331(1)) or domestic terrorism (as defined in 18

U.S.C. § 2331(5)) with respect to an aircraft (including a threat of piracy, or a threat to airline, passenger, or civil aviation security);

2. a threat of committing an act of domestic terrorism (as defined in 18 U.S.C. § 2331(5)) with respect to the homeland;

3. a threat of committing an act of international terrorism (as defined in 18 U.S.C. § 2331(1)) against any U.S. Government facility abroad and associated or supporting personnel, including U.S. embassies, consulates and missions, military installations (as defined by 10 U.S.C. § 2801(c)(4)), U.S. ships, U.S. aircraft, or other auxiliary craft owned or leased by the U.S. Government; *or,*

4. a threat of engaging in or conducting a violent act of terrorism and who is operationally capable of doing so.

ROA.1521. The criteria for inclusion on the Selectee List are not public.

*Id.*

### C. Individuals placed on the watchlist suffer far-reaching consequences without any meaningful way to seek removal from the list.

The consequences of being placed on the watchlist can be life-altering. Most obviously, watchlisted individuals are subjected to enhanced screening procedures or barred from commercial airline travel altogether, turning routine travel into an exhausting and demoralizing ordeal. Mr. Kovac, for example, was placed on the No Fly List and barred from traveling into, out of, or through U.S. airspace for several years, ROA.2127, frustrating his efforts to visit his family in Turkey, ROA.2083, ROA.2094. Mr. Al-Jame was subjected to humiliating secondary

screening procedures at airport security, including being "asked to take off [his] shoes, [his] belt, and empty everything … right in front of everyone," then undergoing a full body search and having his "carry-on bag … searched extensively and swa[bb]ed." ROA.1992. Several Plaintiffs, including Mr. Al-Jame, have been interrogated by federal agents during their travels. *See* ROA.1992, ROA.2007, ROA.2149.

The effects of watchlisting do not end outside an airport's doors. As recent litigation revealed, "the FBI shares an individual's [watchlist] status with over 18,000 state, local, county, city, university and college, tribal, and federal law enforcement agencies and approximately 533 private entities," including "the police and security forces of private railroads, colleges, universities, hospitals, and prisons, as well as animal welfare organizations; information technology, fingerprint databases, and forensic analysis providers; and private probation and pretrial services." *Elhady v. Kable*, 391 F. Supp. 3d 562, 580 (E.D. Va. 2019), *rev'd on other grounds* 993 F.3d 208 (4th Cir. 2021). As a result, a person's watchlist status follows them wherever they go, potentially affecting "any interaction that an individual on the Watchlist has with law enforcement agencies and private entities that use [watchlist] information to screen

individuals they encounter in traffic stops, field interviews, house visits, municipal permit processes, firearm purchases, certain licensing applications, and other scenarios." *Id.* And the federal Government also uses watchlist data in "visa" and "immigration" contexts, *see* ROA.1522, strongly suggesting that watchlist placement adversely affects an individual's ability to obtain permanent residency, citizenship, and other statuses. *Cf. Wagafe v. Trump*, No. C17-0094-RAJ, 2017 WL 2671254, at *1 (W.D. Va. June 21, 2017) (describing allegations that federal immigration authorities unlawfully use vague and overbroad criteria to deny immigration applications).

An individual who is apparently placed on the watchlist has only one avenue for redress: They must complete a standard form and submit it to the Department of Homeland Security's Traveler Redress Inquiry Program (DHS TRIP), which is then processed by the TSC Redress Office. *See* ROA.1524. For most watchlisted individuals, the resulting process is minimal and leads nowhere. The Redress Office reviews the request and determines whether the requester is an exact or near match to the watchlist. ROA.1524-1525. If so, the Redress Office reviews "the available information … includ[ing] any information submitted by the

traveler" to determine whether the individual "should remain in the [watchlist], be modified, or be removed." ROA.1525. DHS TRIP then sends a boilerplate letter to the requester informing them that the inquiry is concluded. *See, e.g.*, ROA.1966, ROA.1988, ROA.2031, ROA.2074, ROA.2180, ROA.2189. That letter does not disclose whether the individual was, or is, included in the watchlist. *See* ROA.1526.

When U.S. citizens and lawful permanent residents on the No Fly List apply for redress, they go through a somewhat more detailed process. Unlike other watchlisted individuals, they "may be apprised of their status" and are "provided an opportunity to request and receive additional information regarding their status," including, "where possible, "an unclassified summary of information supporting the individual's No Fly List status." ROA.1526.

## II. Plaintiffs are law-abiding American citizens caught up in the watchlist's web.

Plaintiffs are U.S. citizens who have never been charged, arrested, or convicted of a terrorism-related offense. They flew for years without incident. Nevertheless, their lives were turned upside-down by their placements on the watchlist.

**Adis Kovac** is an American citizen. In 2014, Mr. Kovac booked a flight to Turkey, his country of birth, to visit his family for the first time since his arrival in the United States in 1996. ROA.2083, ROA.2094. After passing through TSA security, Mr. Kovac was stopped by TSA agents at the gate, who asked to see his identification and boarding pass. ROA.2094. The agents escorted Mr. Kovac to retrieve his luggage, which had been removed from the plane, and questioned him for "three or four hours," causing him to miss his flight. *Id.*

Mr. Kovac rebooked his flight for the next day but, again, after he passed through security, he was barred from boarding the plane. This time, agents confiscated Mr. Kovac's cell phone, escorted him to baggage claim, searched his luggage, and questioned him for "one or two hours." ROA.2094. Mr. Kovac rebooked his flight yet again, but "this time [he] was not allowed to get a boarding pass" and was finally "instructed that [he] was not allowed to travel by plane." ROA.2094. Similarly, in 2017, Mr. Kovac booked a flight from Chicago, Illinois to Newark, New Jersey, but was not allowed to receive a boarding pass when he arrived at the airport. *Id.*

Mr. Kovac submitted a DHS TRIP request in December 2017, ROA.2108, and received official confirmation that he had been placed on the No Fly List a few months later, ROA.2120. In response, Mr. Kovac requested additional information about his placement on the No Fly List. ROA.2127. In January 2018, Plaintiffs filed their complaint in district court. *See* D. Ct. Dkt. 1. On July 18, 2019, Mr. Kovac received a barebones letter from DHS informing him, without elaboration, that "after further review of your inquiry, we have determined that you no longer satisfy the criteria for placement on the No Fly List." ROA.2141. According to the letter, the Government "removed [Mr. Kovac] from the No Fly List" and he "will not be placed back on the No Fly List based on currently available information." *Id.* Mr. Kovac received no information about why he was placed on the No Fly List in the first place, nor any confirmation or denial regarding whether he had been placed instead on a different list, like the Selectee List. *Id.*

**Bashar Al-Jame** is an American citizen. In 2013, Mr. Al-Jame made plans to return to the United States "to settle down with [his] family in San Diego." ROA.1944. He booked a flight from Amman, Jordan to San Diego via Chicago. But at the airport, Mr. Al-Jame was "shocked

to be informed by the airline ticketing agent" that he would be denied boarding. ROA.1962. The agent instructed Mr. Al-Jame to reach out to the American embassy in Amman to determine why he was denied boarding. *Id*.

At the embassy, Mr. Al-Jame was referred to a "Mr. Kevin," who described himself as an FBI agent. ROA.1962. Mr. Kevin and Mr. Al-Jame spoke "in person and over the phone" "[f]or about two weeks," and Mr. Kevin asked Mr. Al-Jame "about all aspects of [Mr. Al-Jame's] life," including his travel and employment history. ROA.1962-63. No answers to Mr. Al-Jame's questions about his denial of boarding were forthcoming: Mr. Al-Jame asked Mr. Kevin "many times what I am accused of and he would reply, you tell me." ROA.1962. Continuing to seek an explanation, Mr. Al-Jame expressed willingness to take a lie detector test. But, after promising to arrange the test, Mr. Kevin stopped contacting Mr. Al-Jame. ROA.1963.

Mr. Al-Jame submitted a DHS TRIP redress request in July 2014. ROA.1937. He received a boilerplate response. In relevant part, the letter read:

> DHS has researched and completed our review of your case. DHS TRIP can neither confirm nor deny any information

15

about you which may be within federal watchlists or reveal any law enforcement sensitive information. However, we have made any corrections to records that our inquiries determined were necessary, including, as appropriate, notations that may assist in avoiding incidents of misinformation.

ROA.1966.

In 2016, Mr. Al-Jame attempted to fly from Dallas, Texas to Amman, Jordan. At Dallas Fort Worth airport, Mr. Al-Jame was subjected to a humiliating ordeal before being allowed to board his flight: He was given a boarding pass with SSSS printed on it, picked out of a crowded security line "and asked to take off [his] shoes, [his] belt, and empty everything … right in front of everyone," subjected to a full body search and other screening, and his "carry-on bag was searched extensively and swa[bb]ed." ROA.1992. Later, as he attempted to board the plane with other passengers, Mr. Al-Jame "went through all the way to the airplane door [and was] then escor[t]ed b[ac]k against the wave of people to the TSA table inside the gate," where his "carry-on was checked and swa[bb]ed again one more time." *Id.*

When Mr. Al-Jame returned to Dallas, he was "escorted by two TSA officers who were expecting [him]" to an interrogation room, where he "had to empty [his] pockets like [he] was guilty of something." ROA.1992.

One of the officers searched Mr. Al-Jame's carry-on bag, took his identification and credit cards, and "interrogated [him] about [his] trip [and] a history of [his] life." *Id.* Although Mr. Al-Jame answered the officer's questions to the best of his ability, "neither of [the] TSA officers gave [him] any reason" for his screening and interrogation. *Id.*

Mr. Al-Jame has been consistently submitted to similarly onerous screening, searches, and interrogations in the years since that incident in Dallas. ROA.1992. He submitted a DHS TRIP redress request in May 2016. ROA.1972. By way of (non-)explanation, he has received only the familiar neither-confirm-nor-deny boilerplate:

> DHS has researched and completed our review of your case. DHS TRIP can neither confirm nor deny any information about you which may be within federal watchlists or reveal any law enforcement sensitive information. However, we have made any corrections to records that our inquiries determined were necessary, including, as appropriate, notations that may assist in avoiding incidents of misidentification.

ROA.1998.

**Suhai Allababidi** is an American citizen. In 2017, Mr. Allababidi planned a one-week summer vacation to Cancun, Mexico with his wife and five children. When the family arrived at Dallas Fort Worth airport, Mr. Allababidi was not able to print out his boarding pass at a kiosk.

17

ROA.2007. He spoke with a ticketing agent, who "spent at least 1 hour trying to print out" the boarding pass before calling Customs and Border Patrol (CBP) to request that the agency "release [the] [re]strictions" on printing out the boarding pass. *Id.*

Once printed, Mr. Allababidi's boarding pass—like those of his wife and five children, including an infant—included an SSSS designation. ROA.2007. The family suffered through an arduous TSA security screening process, which took at least an hour and involved "going through every single item" of carry-on luggage. ROA.2007. The family eventually missed their flight due to the delay and, in attempting to rebook their tickets, went through "the entire process over the phone all over again." *Id.*

At the conclusion of their vacation, the family "arrived at the [Cancun] airport [at] 3am," three hours before their 6am flight back to Texas. ROA.2007. Mr. Allababidi "wanted to make sure [he] had enough time for clearance," anticipating an ordeal similar to that which he endured on his way to Mexico. *Id.* Sure enough, it took the ticketing agent over an hour to get clearance from CBP to print his boarding pass because "no one answered" her calls. *Id.* When someone finally answered, Mr.

Allababidi was informed that he could send his wife and kids ahead of him through security. Mr. Allababidi's wife and four of their children went ahead, with one child remaining with him because the child was so young that he was flying on Mr. Allababidi's lap. *Id.* Thirty minutes before his flight's departure, Mr. Allababidi finally received his boarding pass and was able to board his flight. *Id.* When he arrived in the United States, Mr. Allababidi and his family "had to go through [a] secondary interview" in which "agents asked [him] a bunch of questions like usual" and "went through [their] bags, one piece at a time." *Id.*

Mr. Allababidi's experiences have made him "hate traveling." ROA.2007. In his own words, "I am all for securing my country and [ensuring] my safety and [the] safety of others as well. I understand that screening might be a good thing"—but he does not understand why he has been subjected to repeated delays, interviews, and extra screening when he attempts to fly. *Id.* He has offered to provide the Government with any information it might find helpful: "If there is any way I can help I would be more than happy to do so." *Id.* Mr. Allababidi "has been cooperative with government agents to the best of his ability, and has met with the FBI on more than one occasion." ROA.2067. But in response

19

to his DHS TRIP redress requests, filed in August 2017 and August 2020,

Mr. Allababidi received the same unilluminating response as Mr. Al-

Jame:

> DHS has researched and completed our review of your case.
> DHS TRIP can neither confirm nor deny any information
> about you which may be within federal watchlists or reveal
> and law enforcement sensitive information. However, we have
> made any corrections to records that our inquiries determined
> were necessary, including, as appropriate, notations that may
> assist in avoiding incidents of misinformation.

ROA.2031, ROA.2074.

**Abraham Sbyti** is an American citizen. In February 2015, he flew

from Dallas, Texas to Lebanon through Heathrow Airport in London.

ROA.2149. He endured a variety of extra screening procedures on his

journey to and from Lebanon, including secondary searches and

questioning by law enforcement. *Id*. Two weeks later, he was singled out

for similar treatment when he traveled to Punta Cana, Mexico with his

wife. *Id*.

As he explained in his DHS TRIP redress request filed in March

2015, Mr. Sbyti is "a proud, [l]aw abiding citizen" who "takes the safety

and security of this country very seriously." ROA.2149. He "work[s] hard

and pay[s] [his] taxes on time," and finds "it unfair to be subjected to such

treatment every time [he] go[es] to visit [his] family or have a vacation." *Id.* Mr. Sbyti hoped that "this matter [could] be resolved in a timely and positive fashion," *id.*, but, unfortunately, he received only the now-familiar non-answer from the Government in response to his redress request:

> DHS has researched and completed our review of your case. DHS TRIP can neither confirm nor deny any information about you which may be within federal watchlists or reveal any law enforcement sensitive information. However, we have made any corrections to records that our inquiries determined where necessary, including, as appropriate, notations that may assist in avoiding incidents of misidentification.

ROA.2180.

**Faduma Mohamed Warsame** is an American citizen. In December 2016, she missed her flight from Chicago to Minneapolis, Minnesota "because of extra screening and inability to print [her] boarding pass before [she] had arrived at the airport or at a kiosk." ROA.2189. On her way back to Chicago, she was again unable to print her boarding pass herself and was subjected to extra screening. ROA.2189. Ms. Warsame had experienced similar restrictions "at least 4 more times between March 2015 and July 2016." After the December

2016 incident, she filed a DHS TRIP redress request. *Id.* In response, Ms.

Warsame received the same response as the other Plaintiffs:

> DHS has researched and completed our review of your case.
> DHS TRIP can neither confirm nor deny any information
> about you which may be within federal watchlists or reveal
> any law enforcement sensitive information. However, we have
> made any corrections to records that our inquiries determined
> were necessary, including, as appropriate, notations that may
> assist in avoiding incidents of misidentification.

ROA.2189.

## III. The district court granted summary judgment for the Government.

Plaintiffs sued the federal agencies that create, maintain, and use

the watchlist in their operations, bringing claims under the Due Process

Clause, Equal Protection Clause, nondelegation doctrine, and

Administrative Procedure Act. ROA.2863. As relevant here, Plaintiffs

argued that the watchlist was "in excess of statutory jurisdiction,

authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C),

because its creation and maintenance is an issue of major political or

economic significance that has never been authorized by Congress.

ROA.2793.

The district court agreed that the watchlist "has vast political

significance under the Supreme Court's current formulation of the major-

questions doctrine." ROA.2867. The district court explained that the watchlist "consists of over a million people, and the Government could place an unlimited number of people on it," and "the liberty intrusions that flow from the watchlist are significant." ROA.2867-68. For example, the Government collects "a vast array of identifying information" about listed individuals, subjects them to extra searches and interrogations, distributes watchlist information to "thousands of other entities, and perhaps even impos[es] adverse immigration consequences on listees." ROA.2868.

The district court then concluded that Congress clearly authorized the watchlist. On the district court's reading of the relevant statutory authorities, Congress "authorized the TSA and the FBI to identify potential terrorists and pick a method for monitoring them" as well as "the TSA's use of the watchlist during airport screening." ROA.2869. In light of the TSA and FBI's agency expertise, TSC's two-decade-long use of the watchlist, various federal agencies' pre-2003 maintenance of "twelve different watchlists," and Congress's post-2003 legislation regarding the watchlist and DHS TRIP, the district court believed that "Congress clearly authorized the list." ROA.2870-2874.

23

## SUMMARY OF ARGUMENT

**A.** The district court correctly held that the creation, administration, maintenance, and use of the watchlist is an extraordinary assertion of federal agency power. The Defendant agencies claim the authority to place an unlimited number of people, including U.S. citizens, on a secret watchlist. As the district court explained, the liberty intrusions that result from placement on that list are significant. The TSC compiles biometric and biographic identifying data and distributes it to thousands of entities that use it in various ways, including to deny listed individuals boarding on commercial flights, subject listed individuals to humiliating security screenings and invasive searches, and affect immigration statuses. The separation of powers, principles of statutory interpretation, and common sense demand that the Government justify its claim to such sweeping power with a comparably clear authorization by Congress.

**B.** Because the major questions doctrine applies, Defendant agencies' participation in the watchlisting enterprise is lawful only if Congress has clearly authorized it. Congress has not. Below, both the district court and the Government presented a mishmash of statutory

language, none of which clearly authorizes any of the Defendant agencies to create, maintain, administer, or use a million-name list to infringe on the liberty of U.S. citizens and foreign nationals alike. Most of the proffered language is so vague that it barely warrants discussion. High-level congressional authorization of general law-enforcement and national-security activity is self-evidently inadequate to satisfy the major questions doctrine. Even the more precisely-worded statutory provisions that the Government offers to justify specific uses of the watchlist fall short because they nowhere authorize the creation or maintenance of the watchlist in the first place.

At bottom, a survey of the Government's cited authorities reveals that Congress did not create the watchlist—unelected bureaucrats did. When federal agencies use the watchlist to intrude on the liberty of more than one million individuals, the separation of powers demands more. This Court should reverse the district court's grant of summary judgment and remand the case for additional briefing about the appropriate remedies for the Defendant agencies' unlawful actions.

## STANDARD OF REVIEW

This Court reviews a grant of summary judgment de novo, viewing all the facts and evidence in the light most favorable to the non-movant. *Badgerow v. REJ Props., Inc.*, 974 F.3d 610, 616 (5th Cir. 2020). Summary judgment is appropriate only when there is no genuine dispute as to any material fact. Fed. R. Civ. P. 56(a). When a reasonable jury could return a verdict for the nonmoving party on the summary-judgment record, summary judgment is inappropriate. *Badgerow*, 974 F.3d at 616.

## ARGUMENT

### I. The terrorist watchlist has never been authorized by Congress and is in excess of the relevant agencies' statutory authority.

"Agencies have only those powers given to them by Congress." *Midship Pipeline Co., LLC v. FERC*, 45 F.4th 867, 876 (5th Cir. 2022). Under the major questions doctrine, it is not always enough that an agency asserts regulatory authority with "a colorable textual basis." *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022**)**. In "extraordinary cases," where "the 'history and the breadth of the authority that [the agency] has asserted,' and the 'economic and political significance' of that assertion, provide a 'reason to hesitate before concluding that Congress' meant to confer such authority," *id.* at 2608 (quoting *FDA v. Brown & Williamson*

*Tobacco Corp.*, 529 U.S. 120, 159-60 (2000)), the Government must identify "'clear congressional authorization' for the power it claims," *id.* at 2609 (quoting *Utility Air Reg. Grp. v. EPA*, 573 U.S. 302, 324 (2014)).

Here, the major questions doctrine applies because the Government claims extraordinary, far-reaching authority for its agencies to create and administer the watchlist. Congress has never clearly authorized any federal agency to wield that power, so this Court should hold that the watchlist exceeds the relevant agencies' statutory authority.

### A. The major questions doctrine applies because the watchlist is an extraordinary assertion of federal agency power.

#### 1. The district court correctly held that the watchlist poses a major question.

The district court correctly held that federal agencies' claims of power to create, administer, maintain, and use the watchlist pose a major question. ROA.2868. Each agency before this Court claims the power to make "a significant encroachment into the lives … of a vast number" of people. *NFIB v. OSHA*, 142 S. Ct. 661, 665 (2022). Specifically, the agencies that make up the TSC proclaim the ability to create a federal terror watchlist and place an unlimited number of people on it, ensnaring them in an invisible web of consequences imposed indefinitely and

27

without recourse. *See* ROA.2867-68. Individuals may be placed on the watchlist based only on a prospective determination that the individual may, in the future, engage or intend to engage in terrorism, ROA.1521, "even when those individuals cannot legally be arrested, detained, or otherwise restricted in their movements or conduct," *Mohamed v. Holder*, No. 1:11-cv-50, Dkt. 70 at 19 (E.D. Va. Jan. 17, 2018) (at ROA.244).

When the TSC places an individual on the watchlist, it makes a "sweeping pronouncement" about that individual that affects them "in the profoundest of ways." *See BST Holdings, LLC v. OSHA*, 17 F.4th 604, 611 (5th Cir. 2021). As the district court put it, "the liberty intrusions that flow from the watchlist are significant." ROA.2868; *see In re MCP No. 165*, 20 F.4th 264, 273 (6th Cir. 2021) (mem) (Sutton, J., dissenting) ("[T]he intrusion on individual liberty is serious."). The TSC compiles "biographic and biometric identifying information (e.g., name, date of birth, photographs, iris scans, and/or fingerprints)" of listed individuals, ROA.1519, and then distributes that information to scores of entities. Those entities include TSA, which uses that information to deny some individuals boarding on commercial flights and subject others to extensive security screening. *See* ROA.1519. In this case alone, "TSA

agents executed a 'full body search'" on Mr. Al-Jame and "Government agents likewise interrogated many" of the Plaintiffs. ROA.2868; *see* ROA.1992, ROA.2007, ROA.2094.

Federal agencies also use watchlist data in visa and immigration contexts, strongly suggesting that watchlist placement adversely affects an individual's ability to obtain permanent residency, citizenship, and other statuses. *See* ROA.1522; ROA.2868; *cf. Wagafe v. Trump*, No. C17-0094-RAJ, 2017 WL 2671254, at *1 (W.D. Va. June 21, 2017). And TSC distributes watchlist information to thousands of law-enforcement and private entities, where it impacts "traffic stops, field interviews, house visits, municipal permit processes, firearm purchases, certain licensing applications, and other scenarios." *Elhady v. Kable*, 391 F. Supp. 3d 562, 580 (E.D. Va. 2019), *rev'd on other grounds* 993 F.3d 208 (4th Cir. 2021); *see* ROA.2868. In creating, maintaining, and using the watchlist, federal agencies therefore claim the power to intrude into the lives of millions of people without notice or, in most cases, any explanation at all.

29

## 2. The Government's arguments to the contrary are unconvincing.

Below, the Government argued that the creation, administration, maintenance, and use of the watchlist does not pose a major question for a variety of different reasons. None carry the day.

First, the Government claimed that federal agencies' watchlist-related activity does not pose a major question because it "does not involve any novel assertion of 'extravagant statutory power over the national economy.'" ROA.2835 (quoting *West Virginia*, 142 S. Ct. at 2609). The district court properly rejected that argument. *See* ROA.2867 n.42. Although the Supreme Court has emphasized the economic impact of some agency decisions that it held to be major questions, the Court has never suggested that economic significance is a necessary, rather than sufficient or relevant, condition for a question to be major. *See, e.g.*, *Brown & Williamson*, 529 U.S. at 126-27, 137; *Utility Air Reg. Grp.*, 573 U.S. at 310-11, 324; *West Virginia*, 142 S. Ct. at 2610.

Rather, in expounding upon and applying the major questions doctrine, courts have repeatedly explained that the doctrine applies to "broad assertions of policymaking authority" that impose "serious" "intrusion[s] on individual liberty." *In re MCP No. 165*, 20 F.4th at 272-

30

73 (Sutton, J., dissenting). When this Court held that the federal Government's employee-vaccination mandate posed a major question, for example, its decision focused on the liberty-invading, rather than economic, harms of the mandate. This Court described the mandate as empowering unelected government officials "in the deep recesses of the federal bureaucracy to make sweeping pronouncements on matters of public health affecting every member of society in the profoundest of ways." *BST Holdings, LLC*, 17 F.4th at 611. The Supreme Court retained that non-economic focus when reviewing the mandate. *See NFIB*, 142 S. Ct. at 665 (describing the mandate as "a significant encroachment into the lives—and health—of a vast number of employees" and, accordingly, "no everyday exercise of federal power"); *see also Ala. Ass'n of Realtors v. Dep't of Health and Human Servs.*, 141 S. Ct. 2485, 2489 (2021) (describing the "issues at stake" in the CDC eviction moratorium case as "not merely financial").

The Government also claimed that the watchlist does not pose a major question because it is "a government policy that has existed for decades, and which applies only to a small number of U.S. persons reasonably suspected of ties to terrorism." ROA.2834. For starters, while

31

"only" thousands of U.S. citizens and lawful permanent residents are currently on the watchlist, the list contains over one million names, and the Government claims the power to place an unlimited number of people—including U.S. citizens and lawful permanent residents—on the list. *See* ROA.2867-68. The Government cites no authority suggesting that its own discretionary restraint in applying the powers it claims to possess should cut in its favor in determining whether a major question exists.

As for the watchlist's origins in 2003, to the extent the Government (again, without any support) suggests that an agency's assertion of power may become less major over time, the Government is mistaken. An agency's exercise of vast political or economic power does not dissipate in significance as time goes on. Federal bureaucrats "ordering 84 million Americans to either obtain a COVID-19 vaccine or undergo weekly medical testing at their own expense," *NFIB*, 142 S. Ct. at 665, would not be any less of an encroachment on individual liberty if the mandate persisted for two decades before facing a major questions doctrine challenge. A nationwide eviction moratorium would not become less intrusive on the landlord-tenant relationship as months or years passed.

32

*See Ala. Ass'n of Realtors*, 141 S. Ct. at 2489. If anything, the intrusion on individual liberty may become even more serious over time, as the agency continues to further "exploit some gap, ambiguity, or doubtful expression in Congress's statutes to assume responsibilities far beyond its initial assignment." *NFIB*, 142 S. Ct. at 669 (Gorsuch, J., concurring). That the Government has spent decades placing innocent people, including U.S. citizens, on a secret list that makes travel a humiliating ordeal and affects countless other aspects of their lives merely demonstrates the significance of the issue before this Court.

### B. Congress has not clearly authorized federal agencies to create and maintain the watchlist.

"When much is sought from a statute, much must be shown." *In re MCP No. 165*, 20 F.4th at 267 (Sutton, J., dissenting). Where, as here, federal agencies' assertions of power raise a major question, "both separation of powers principles and a practical understanding of legislative intent make us 'reluctant to read into ambiguous statutory text' the delegation claimed to be lurking there." *West Virginia*, 142 S. Ct. at 2609 (quoting *Utility Air*, 573 U.S. at 324). To overcome that reluctance, "[t]he agency instead must point to 'clear congressional authorization' for the power it claims." *Id.* (quoting *Utility Air*, 573 U.S.

33

at 324). That rigorous inquiry "guard[s] against unintentional, oblique, or otherwise unlikely delegations of legislative power," providing "a vital check on expansive and aggressive assertions of executive authority." *NFIB*, 142 S. Ct. at 669 (Gorsuch, J., concurring) (quoting *United States Telecom. Ass'n v. FCC*, 855 F.3d 381, 417 (D.C. Cir. 2017) (Kavanaugh, J., dissenting from denial of rehearing en banc)).

The district court held that Congress clearly authorized the watchlist. But in so holding, the district court did not conclude that the text of any specific statute clearly authorized federal agencies to create, maintain, and use the watchlist. Instead, the district court followed the Government's lead and cobbled together (supposedly) clear statutory authorization from a hodgepodge of different laws, none of which— whether viewed separately or together—comes close to supplying clear congressional authorization. *See* ROA.2866-74.

### 1. The FBI is not clearly authorized to create, maintain, or use the watchlist.

The FBI is the lynchpin of the Government's watchlisting efforts. It leads the administration of the TSC, the multi-agency body that develops, maintains, and distributes the watchlist, *see* ROA.1535, nominates individuals to the watchlist, reviews other agencies'

nominations of individuals to the watchlist, ROA.1520, and uses the watchlist in its investigations and domestic law enforcement efforts, ROA.1522.

In the district court, the Government pointed to only one statute as statutory authorization for those sweeping powers: 28 U.S.C. § 533. *See* ROA.2836. But 28 U.S.C. § 533 does not come close to clearly authorizing the FBI to compile a list of over one million people, collect their highly sensitive personal information, distribute that list to thousands of public, private, and foreign entities, and use it in its own operations. Rather, it gives the Attorney General the power to appoint officials "to detect and prosecute crimes against the United States," "assist in the protection of the person of the President," "assist in the protection of the person of the Attorney General," and "conduct such other investigations regarding official matters under the control of the Department of Justice and the Department of State as may be directed by the Attorney General." 28 U.S.C. § 533. That general authorization to conduct law-enforcement actions is a far cry from clear congressional authorization to create and operate a watchlist that could turn an unlimited number of people into second-class citizens.

### 2. DHS is not clearly authorized to create, maintain, or use the watchlist.

DHS coordinates with the FBI to administer the watchlist, ROA.1519, nominates individuals to the watchlist, ROA.1520, and uses the watchlist in its operations, ROA.1522. The agency does not fare any better than the FBI in seeking statutory authorization for those actions.

The Government argues that three provisions of the Homeland Security Act provide clear authority for DHS's creation, maintenance, and use of the watchlist. *See* ROA.2835 (citing 6 U.S.C. §§ 111(b)(1)(A), 111(b)(1)(B), 202(1)); *see also* ROA.2869, ROA.2871 (district court relying on those provisions). But the cited provisions are remarkably vague, merely describing the "primary mission" of DHS to include "prevent[ing] terrorist attacks within the United States" and "reduc[ing] the vulnerability to the United States to terrorism," and giving DHS the responsibility to "[p]revent[] the entry of terrorists and the instruments of terrorism into the United States." 6 U.S.C. §§ 111(b)(1)(A), 111(b)(1)(B), 202(1).

To be sure, DHS's watchlist-related activity has "a colorable textual basis" in the Homeland Security Act. *West Virginia*, 142 S. Ct. at 2609. But broad-brush enabling legislation cannot provide the "clear

congressional authorization" that such a weighty question demands. *Id.* And enabling legislation like the Homeland Security Act "is generally not an open book to which the agency may add pages and change the plot line." *West Virginia*, 142 S. Ct. at 2609 (quoting E. Gellhorn & P. Verkuil, *Controlling* Chevron *Based Delegations*, 20 Cardozo L. Rev. 989, 1011 (1999)) (cleaned up). If Congress meant to endow DHS with the power to infringe on the liberty of millions of people, including U.S. citizens, by compiling and using a secret watchlist, it would have, at the very least, mentioned a watchlist. *See Brown v. U.S. Dep't of Educ.*, No. 4:22-cv-0908, 2022 WL 1685825, at *13 (N.D. Tex. Nov. 10, 2022) ("If Congress provided *clear* congressional authorization for $400 billion in student loan forgiveness via the HEROES Act, it would have mentioned loan forgiveness.") (emphasis in original). It did not, and the Government cannot find clear congressional authorization in such vague, high-level language.

### 3. CBP is not clearly authorized to create, maintain, or use the watchlist.

CBP is one of the "largest end users" of the watchlist, using it to "vet[] and inspect[] … travelers seeking entry to the United States or between ports of entry, at preclearance facilities abroad, and during the

processing of trusted traveler applications." ROA.1522. CBP also nominates individuals to the watchlist. ROA.1520. In trying to justify CBP's participation in the watchlisting enterprise, the Government cannot find a single statute that even mentions terrorism, let alone a watchlist. Rather, the Government's proffered authorities merely concern CBP's power to conduct searches and other activities at the border. *See* ROA.2836 (citing 19 U.S.C. §§ 482, 1455, 1459, 1461, 1467, 1499, 1581, 1582). They do not come close to providing the clear congressional authorization that "both separation of powers principals and a practical understanding of legislative intent" demand. *West Virginia*, 142 S. Ct. at 2609.

### 4. TSA is not clearly authorized to create, maintain, or use the watchlist.

TSA uses the watchlist for "air passenger screening and transportation security credential vetting" and nominates individuals to the watchlist but does not participate in the TSC's creation and administration of the list. *See* ROA.1519, ROA.1520, ROA.1522. Again, the Government's and district court's efforts to find clear authorization for that power fall flat.

Most of the cited provisions are so vague as to barely warrant discussion. *See* ROA.2835-36. 49 U.S.C. § 114(d), for example, gives the Administrator responsibility "for security in all modes of transportation," including "civil aviation security." A few subsections down, Section 114(f)(3) and (f)(4) direct the Administrator to "develop policies, strategies, and plans for dealing with threats to transportation security" and to "make other plans related to transportation security." *See also* § 114(e)(1) (directing the Administrator to "be responsible for day-to-day Federal security screening operations for passenger air travel and intrastate air transportation"); *id.* § 114(l)(1) (authorizing the Administrator "to issue, rescind, and revise such regulations as are necessary to carry out the functions of the Administration"); 49 U.S.C. § 44903(b) (directing the Administrator to "prescribe regulations to protect passengers and property on an aircraft operating in air transportation or intrastate air transportation against an act of criminal violence or aircraft piracy").

As already discussed above (at 36-37), general congressional authorization to keep travelers safe from terrorism is not sufficient to show that "Congress sp[oke] clearly when authorizing an agency to

39

exercise powers of vast economic and political significance." *Alabama Ass'n of Realtors*, 141 S. Ct. at 2489 (quotation marks omitted). The wide-ranging statutory provisions on which the Government relies recall the Surgeon General's authority to adopt measures "necessary to prevent the introduction, transmission, or spread of communicable diseases," *see id.* at 2487 (Breyer, J., dissenting) (quoting 42 U.S.C. § 264(a)), and the FDA's authority to regulate "drugs" and "devices," *Brown & Williamson*, 529 U.S. at 126-27. When the Government claims the power to intrude on the liberty of millions, courts require it to show more than a "merely plausible textual basis for the agency action." *West Virginia*, 142 S. Ct. at 2609 (quoting *Utility Air*, 573 U.S. at 324).

Other cited provisions may grant TSA the power to use the watchlist to screen passengers but nowhere authorize any agency to create, maintain, or administer the watchlist in the first place. Of all the statutory language cited by the Government and the district court, 49 U.S.C. § 114(h) comes the closest to providing clear congressional authorization for any watchlist-related activity. That provision orders the Administrator to "enter into memoranda of understanding with Federal agencies or other entities to share or otherwise cross-check as

necessary data on individuals identified on Federal agency databases who may pose a risk to transportation or national security," "establish procedures for notifying" various officials "of the identity of individuals known to pose, or suspected of posing, a risk of air piracy or terrorism or a threat to airline or passenger safety," and "establish policies and procedures requiring air carriers to use information from government agencies to identify individuals on passenger lists who may be a threat to civil aviation or national security; and if such an individual is identified, notify appropriate law enforcement agencies, prevent the individual from boarding an aircraft, or take other appropriate action with respect to that individual." *Id.* § 114(h)(1), (h)(2), (h)(3)(A)-(B).

That language—which nowhere makes any mention of a watchlist—does not provide clear congressional authorization for TSA to use the watchlist in "air passenger screening and transportation security credential vetting." ROA.1522. And even if it does, 49 U.S.C. § 114(h) indisputably pertains only to the TSA, not the TSC, FBI, CBP, or any other federal agency or entity that creates, maintains, or uses the watchlist. *See* Aviation and Transportation Security Act of 2001, Pub. L. 107-71, 115 Stat. 597-600 (Nov. 19, 2001) (enacting the language codified

41

at 49 U.S.C. § 114(h)). The Supreme Court has instructed that, when an agency takes an action that implicates the major questions doctrine, "the agency action" itself—not the more general category or subject matter at issue—must be authorized by statute. *See West Virginia*, 142 S. Ct. at 2609. The key question is "whether Congress in fact meant to confer the power the agency has asserted," not whether Congress happened to authorize a different agency to take a different, but related, action. *Id.* at 2608. So even if TSA is authorized to use a list for the purposes laid out in Section 114(h), that statutory language has no bearing on whether Congress clearly authorized the agencies participating in the TSC to create, maintain, and administer the watchlist in the first place.

Similarly, to justify TSA's watchlist-related activity, the district court looked to 49 U.S.C. § 44904(a), in which Congress instructed TSA and the FBI to identify individuals "with the capability and intent to carry out terrorist … acts" and to "carry out the most effective method for continuous analysis and monitoring of" those individuals. *See* ROA.2873. But TSA does not create, administer, or maintain the watchlist at all; that role falls to TSC, which does not even include the TSA as one of its participating agencies. *See* ROA.1519. And while FBI plays a lead role in

administering the TSC, it does so in conjunction with the Department of State, DHS, DOJ and Office of the Director of National Intelligence, not TSA. *Id.* If it is relevant at all, Section 44904(a) cuts against the Government by illustrating that Congress never imagined an entity like the TSC wielding such control over the monitoring and identification of individuals suspected to be terrorists—rather, it anticipated that the TSA and FBI would work together to do so.

The district court also concluded that "Congress has repeatedly ratified" the watchlist by citing to 49 U.S.C. § 44903(j)(2), which directs the TSA "to compar[e] passenger information … to the automatic selectee and no fly list" and DHS, "in consultation with the Terrorist Screening Center, [to] design and review … operating procedures for the collection … of data … in the no fly and automatic selectee lists." ROA.2874 (citing 49 U.S.C. § 44903(j)(2)(C)(i), (j)(2)(C)(v), (j)(2)(E)(iii)). But Congress's after-the-fact acquiescence to an agency's power grab cannot provide the clear congressional authorization for the agency's action. Rather, Congress's clear authorization must come before the agency asserts the power to significantly intrude on the liberty of millions of Americans.

The separation of powers cannot tolerate a different outcome. If Congress can ratify an agency's otherwise-unauthorized actions by simply acknowledging them in a later-enacted statute, elected representatives would be incentivized to avoid responsibility for unpopular actions by allowing federal bureaucrats to rush into the legislative void. Even if Congress would prefer to pass the buck on making difficult decisions on the pressing issues of the day, the major questions doctrine demands that "the national government's power to make the laws that govern us remains where Article I of the Constitution says it belongs—with the people's elected representatives." *NFIB*, 142 S. Ct. at 668 (Gorsuch, J., concurring). As the Supreme Court explained in the anticommandeering context, it is critical to a healthy democracy that our elected representatives not be artificially "insulated from the electoral ramifications of their decision[s]." *New York v. United States*, 505 U.S. 144, 169 (1992). "When Congress itself regulates, the responsibility for the benefits and burdens of the regulation is apparent. Voters who like or dislike the effects of the regulation know who to credit or blame." *Murphy v. NCAA*, 138 S. Ct. 1461, 1477 (2018). Congress may not dodge that responsibility by allowing unelected bureaucrats to enact

highly-significant nationwide policy and then, relieved to have their homework done for them, acknowledging that unauthorized action after the fact.

### 5. None of the district court's other arguments overcome the utter lack of clear statutory authorization.

To compensate for the lack of clear textual authorization, the district court offers a smattering of other arguments in favor of agencies' power to create, maintain, and use the watchlist. None are convincing.

The district court circles back to some of the same vague language discussed above (at 34-35, 36-37, 41-43) to claim that "the Government possesses the expertise necessary to create and maintain a terrorist watchlist." ROA.2871 (citing 6 U.S.C. § 114(h)(2), 6 U.S.C. § 111(b)(1)(A), 28 U.S.C. § 533(1)). But barebones statements that DHS has expertise in "preventing terrorist attacks," TSA knows how to "identify individuals known to pose a risk of terrorism," and the FBI "has expertise in detecting crimes against the United States," ROA.2871 (cleaned up), are far from sufficient to show that, before 2003, the agencies had "comparative expertise in making certain policy judgments" related to

the administration of a sprawling federal watchlist that could affect the lives of millions of people. *See NFIB*, 142 S. Ct. at 665.

Relatedly, the district court alleges that the agencies' post-HSPD-6 creation of the federal terror watchlist was "premised on a novel reading of a long-extant statute" because "the TSC has maintained the watchlist for nearly two decades" and, before that, "nine agencies maintained twelve different watchlists." ROA.2871-72 (cleaned up). Along those same lines, the district court asserts that the watchlist does not transform the powers given to the relevant agencies nor fundamentally revise any of the statutes at issue. *See* ROA.2872-73.

But the pre-2003 watchlists were vastly more limited than the modern consolidated federal terror watchlist, as the agencies used them only "to help secure our nation's borders."[3] Just as "no [CDC] regulation premised on [the statutory provision at issue in *Alabama Association of Realtors*] has even begun to approach the size or scope of the eviction moratorium," no watchlist maintained by the federal Government before

---

[3] U.S. General Accounting Office, *Information Technology: Terrorist Watch Lists Should Be Consolidated to Promote Better Integration and Sharing*, GAO-03-022, at 6-7.

2003 was recognizably analogous to today's watchlist in size, scope, or level of intrusion on listees' individual liberty. *See Alabama Ass'n*, 141 S. Ct. at 2489. As for the watchlist's two-decade-long pedigree, as already discussed above (at 32-33), the severity of liberty intrusions from unauthorized agency actions do not diminish over time, and no opinion by any court of appeals or the Supreme Court has ever suggested otherwise. The proper inquiry is whether, when the agency first asserted the challenged power, that power was clearly authorized by statute. Neither the Government nor the district court can point to any act of Congress that expressly authorizes the creation, maintenance, or use of the federal terror watchlist—because none exists.

* * *

The separation of powers' demand that agencies must ground their actions in a valid grant of authority from Congress does not fall away when the agencies claim a national-security justification for their actions. "Shortcuts in furthering preferred policies, even urgent policies, rarely end well, and they always undermine, sometimes permanently, the American vertical and horizontal separation of powers, the true mettle of the U.S. Constitution, the true long-term guardian of liberty." *In re MCP*

*No. 165*, 20 F.4th at 269 (Sutton, J., dissenting). Because Congress has never passed any law authorizing the creation, maintenance, or operation of the watchlist, this Court should hold that the Defendant agencies' participation in the watchlisting system is in excess of their statutory powers.

## CONCLUSION

This Court should reverse the district court's grant of summary judgment and remand the case to the district court for additional briefing about the appropriate remedies for Defendants' statutory violations.

Respectfully submitted,

Date: June 21, 2023

<u>/s/ Lena F. Masri</u>
Lena F. Masri
Gadeir I. Abbas*
Justin Sadowsky
Hannah Mullen
CAIR LEGAL DEFENSE FUND
453 New Jersey Ave. SE
Washington, DC 20003
(202) 742-6420

Counsel for Plaintiffs-Appellants

*Gadeir I. Abbas licensed to practice in Virginia only. Practice limited to federal matters.*

## CERTIFICATE OF COMPLIANCE

This document complies with type-volume limits of Fed. R. App. R. 32(7)(b) because, excluding the parts of the document exempted by Fed. R. App. R. 32(f), this brief contains 9,250 words.

This complies with the typeface and type style requirements because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.


/s/ Lena Masri
Lena F. Masri

**CERTIFICATE OF SERVICE**

I hereby certify that, on June 21, 2023, I electronically filed the foregoing document with the Clerk of the Court for the U.S. Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system.

/s/ Lena F. Masri
Lena F. Masri