No. 23-10284

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

Adis Kovac; Bashar Aljame; Abraham Sbyti;
Suhaib Allababidi; Fadumo Warsame,
Plaintiffs-Appellants,

v.

Christopher Wray, Director of the Federal Bureau of Investigation, in his official
capacity; Charles H. Kable, Director of the Terrorist Screening Center; in his
official capacity; Deborah Moore, Director, Transportation Security Redress
(OTSR); in her official capacity; Nicholas Rasmussen, Director of the National
Counterterrorism Center, in his official capacity; David P. Pekoske, Administrator
Transportation Security Administration (TSA); in his official capacity; Kevin K.
McAleenan, Acting Commissioner United States Customs and Border Protection;
in his official capacity,
Defendants-Appellees.

On Appeal from the United States District Court
for the Northern District of Texas

## BRIEF FOR APPELLEES

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney*
*General*

LEIGHA SIMONTON
*United States Attorney*

SHARON SWINGLE
JOSHUA WALDMAN
*Attorneys, Civil Division, Appellate Staff*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-0236*

# CERTIFICATE OF INTERESTED PERSONS

*Adis Kovac, et al. v. Christopher Wray, et al.*, No. 23-10284

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

s/Joshua Waldman<br>
Joshua Waldman

Plaintiffs-appellants:

Adis Kovac; Bashar Aljame; Abraham Sbyti; Suhaib Allababidi; and Fadumo Warsame

Defendants-appellees:

Christopher Wray, Director of the Federal Bureau of Investigation, in his official capacity; Charles H. Kable, Director of the Terrorist Screening Center; in his official capacity; Deborah Moore, Director, Transportation Security Redress (OTSR); in her official capacity; Nicholas Rasmussen, Director of the National Counterterrorism Center, in his official capacity; David P. Pekoske, Administrator Transportation Security Administration (TSA); in his official capacity; Kevin K. McAleenan, Acting Commissioner United States Customs and Border Protection; in his official capacity

Counsel:

For plaintiffs-appellants:

Lena F. Masri, Gadeir I. Abbas, Justin Sadowsky, Hannah Mullen, CAIR Legal Defense Fund

For defendants-appellees:

Joshua Waldman, Sharon Swingle, U.S. Department of Justice

## STATEMENT REGARDING ORAL ARGUMENT

The government stands ready to present oral argument if this Court determines that it would be useful.

## TABLE OF CONTENTS

**Page**

STATEMENT OF JURISDICTION.........................................................................1

STATEMENT OF THE ISSUE..............................................................................1

STATEMENT OF THE CASE................................................................................1

     A.     Statutory and Regulatory Background.............................................1

           1.     The Terrorist Screening Center and Terrorist Screening Dataset.............................................................................1

           2.     The Transportation Security Administration and Passenger Screening...................................................2

           3.     U.S. Customs and Border Protection and Border Searches................................................................3

     B.     Factual Background .........................................................................5

     C.     Prior Proceedings............................................................................6

SUMMARY OF ARGUMENT ..............................................................................8

STANDARD OF REVIEW ..................................................................................10

ARGUMENT .......................................................................................................10

I.     PLAINTIFFS' ARGUMENT IS LIMITED TO THE STATUTORY AUTHORITY TO USE THE WATCHLIST FOR TSA'S AIRPORT SCREENING FUNCTION .................................................................10

II.     CONGRESS CLEARLY AUTHORIZED THE CREATION, MAINTENANCE, AND USE OF THE WATCHLIST ...................................14

     A.     Statutory Authorization to Investigate, Collect and Analyze Terrorist-Related Intelligence .....................................................15

B.    Statutory Requirements to Share Intelligence Among Federal
      Agencies and with Appropriate State and Local Officials ...................17

C.    Statutes Authorizing or Requiring Screening Against the
      Watchlist..........................................................................................22

D.    Statutes Authorizing or Requiring TSA to Screen Passengers
      Against the Watchlist......................................................................25

E.    Plaintiffs' Contrary Arguments Are Meritless ........................................27

III.   THE MAJOR QUESTIONS DOCTRINE DOES NOT APPLY.....................31

CONCLUSION.................................................................................................38

CERTIFICATE OF SERVICE
CERTIFICATE OF COMPLIANCE

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abdi v. Wray,*
    942 F.3d 1019 (10th Cir. 2019) ................................................ 13, 32

*AMG Capital Mgmt. v. FTC,*
    141 S. Ct. 1341 (2021)....................................................................29

*Beydoun v. Sessions,*
    871 F.3d 459 (6th Cir. 2017) ........................................................32

*Biden v. Missouri,*
    142 S. Ct. 647 (2022) (per curiam)................................................33

*Corbett v. TSA,*
    767 F.3d 1171 (11th Cir. 2014) ....................................................32

*El Ali v. Barr,*
    473 F. Supp.3d 479 (D. Md. 2020)................................................15

*Electronic Privacy Info. Ctr. v. DHS,*
    653 F.3d 1 (D.C. Cir. 2011) ..........................................................32

*Elhady v. Kable,*
    993 F.3d 208 (4th Cir. 2021) ...................................... 3, 13, 15, 32

*Elhady v. Piehota,*
    303 F. Supp.3d 453 (E.D. Va. 2017) ............................................15

*FDA v. Brown & Williamson Tobacco Corp.,*
    529 U.S. 120 (2000)......................................................................30

*Ghedi v. Mayorkas,*
    16 F.4th 456 (5th Cir. 2021) ........................................... 2, 3, 32

# TABLE OF AUTHORITIES (CONT'D)

**Cases**

*Ibrahim v. DHS*,
    669 F.3d 983 (9th Cir. 2012) ........................................................15

*Kariuki v. Tarango*,
    709 F.3d 495 (5th Cir. 2013) ...........................................................9

*Kashem v. Barr*,
    941 F.3d 358 (9th Cir. 2019) ...........................................................3

*Kovac v. Wray*,
    --- F. Supp.3d ----, 2023 WL 2430147 (N.D. Tex. 2023) ...........................7, 8

*Kovac v. Wray*,
    2020 WL 6545913 (N.D. Tex. 2020) ...............................................7

*Kovac v. Wray*,
    363 F. Supp.3d 721 (N.D. Tex. 2019) ........................................5, 6

*Kovac v. Wray*,
    449 F. Supp.3d 649 (N.D. Tex. 2020) ........................................5, 6

*Mohamed v. Holder*,
    266 F. Supp.3d 868 (E.D. Va. 2017) ...........................................15

*National Fed'n of Indep. Bus. v. Dep't of Labor*,
    142 S. Ct. 661 (2022) (per curiam)...............................................31

*Salloum v. Kable*,
    2020 WL 7480549 (E.D. Mich. 2020) ........................................15

*Swayne & Hoyt v. United States*,
    300 U.S. 297 (1937)......................................................................29

# TABLE OF AUTHORITIES (CONT'D)

## Cases

*United States v. Clay*,
638 F.2d 889 (5th Cir. 1981) ...................................................32

*United States v. Montoya de Hernandez,*
473 U.S. 531 (1985).....................................................................3

*United States v. Skipwith*,
482 F.2d 1272 (5th Cir. 1973) .................................................32

*Utility Air Regulatory Grp. v. EPA*,
573 U.S. 302 (2014).................................................................33

*West Virginia v. EPA*,
142 S. Ct. 2587 (2022)........................................................ 30, 31

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952)...............................................................30

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
576 U.S. 1 (2015).....................................................................30

## Statutes

6 U.S.C. § 111(b)(1)(A) .............................................................34

6 U.S.C. § 121(d)(1).....................................................................16

6 U.S.C. § 121(d)(12)...................................................................16

6 U.S.C. § 122(a)(1).....................................................................17

6 U.S.C. § 122(d)(2).....................................................................17

**Statutes**

6 U.S.C. § 123(c)(4)(A) ........................................................................19

6 U.S.C. § 124(a) .................................................................................19

6 U.S.C. § 124(b)(3) ............................................................................19

6 U.S.C. § 124a(a) ...............................................................................20

6 U.S.C. § 124a(c)(1)(B) ......................................................................20

6 U.S.C. § 124b(a) ...............................................................................20

6 U.S.C. § 126(a)(1) .............................................................................20

6 U.S.C. § 126(a)(2) .............................................................................20

6 U.S.C. § 203(2) .................................................................................35

6 U.S.C. § 211 .......................................................................................4

6 U.S.C. § 211(g)(4)(C)(i) ....................................................................25

6 U.S.C. § 211(g)(4)(C)(v) ...................................................................25

6 U.S.C. § 482(a)(1)(A) ................................................................. 17, 20

6 U.S.C. § 482(b)(1) .............................................................................17

6 U.S.C. § 482(f)(1) ..............................................................................17

6 U.S.C. § 485(a)(3) .............................................................................18

6 U.S.C. § 485(b)(1)(A) ........................................................................18

**Page(s)**

**Statutes**

6 U.S.C. § 485(b)(1)(C) ..........................................................................................18

6 U.S.C. § 485(b)(2)(C) ..........................................................................................18

6 U.S.C. § 485(b)(2)(K) ..........................................................................................18

6 U.S.C. § 488a(*i*)(2)(A) .......................................................................................23

6 U.S.C. § 621(10) .............................................................................................. 23, 24

6 U.S.C. § 622(d)(2)(A)(ii) .....................................................................................23

6 U.S.C. § 622(d)(2)(B)(i)(I) ...................................................................................23

6 U.S.C. § 1140 ......................................................................................................21

6 U.S.C. § 1162(e)(2) ..............................................................................................22

6 U.S.C. § 1163(b)(7) ..............................................................................................24

6 U.S.C. § 1164(a)(3)(D) .........................................................................................24

6 U.S.C. § 1181(e)(2) ..............................................................................................22

19 U.S.C. § 482 .........................................................................................................4

19 U.S.C. § 482(a) ...................................................................................................32

19 U.S.C. § 1431 ................................................................................................. 25, 32

19 U.S.C. § 1461 .......................................................................................................4

19 U.S.C. § 1496 ................................................................................................. 4, 32

# TABLE OF AUTHORITIES (CONT'D)

**Statutes**

28 U.S.C. § 533 .................................................................................15

28 U.S.C. § 534(a)(1) .........................................................................15

28 U.S.C. § 534(a)(4) .........................................................................15

28 U.S.C. § 538 ..................................................................................16

28 U.S.C. § 1291 ..................................................................................1

28 U.S.C. § 1331 ..................................................................................1

46 U.S.C. § 70105(a) ..........................................................................23

46 U.S.C. § 70105(d) ..........................................................................23

49 U.S.C. § 114(d) ...............................................................................2

49 U.S.C. § 114(d)(1) .........................................................................34

49 U.S.C. § 114(e) ..............................................................................31

49 U.S.C. § 114(e)(1) ..................................................................... 2, 34

49 U.S.C. § 114(f)(3) ............................................................................2

49 U.S.C. § 114(h)(1) ............................................................. 25, 27, 28

49 U.S.C. § 114(h)(2) .........................................................................27

49 U.S.C. § 114(h)(3) .......................................................... 3, 25, 27, 28

49 U.S.C. § 44901(a) ..........................................................................31

# TABLE OF AUTHORITIES (CONT'D)

**Statutes**

49 U.S.C. § 44903(j)(2)(C) .................................................................3

49 U.S.C. § 44903(j)(2)(C)(i) ...........................................................26

49 U.S.C. § 44903(j)(2)(C)(ii) ..........................................................26

49 U.S.C. § 44903(j)(2)(D) ...............................................................22

49 U.S.C. § 44903(j)(2)(E)(i)(I) ........................................................26

49 U.S.C. § 44903(j)(2)(E)(iii) ................................................... 26, 28

49 U.S.C. § 44909(a) ........................................................................25

49 U.S.C. § 44909(b) ........................................................................25

49 U.S.C. § 44909(c)(1) ....................................................................25

49 U.S.C. § 44909(c)(6)(A) ..............................................................25

49 U.S.C. § 44917(c)(2) ....................................................................22

49 U.S.C. § 44919(j) ........................................................................22

50 U.S.C. § 3024(f)(1)(A) .................................................................35

50 U.S.C. § 3036(d) ..........................................................................16

50 U.S.C. § 3056(d)(1)................................................................ 16, 35

Aviation and Transportation Security Act,
      Pub. L. No. 107-71, 115 Stat. 597 (2001) ....................................34

# TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

**Statutes**

Homeland Security Act of 2002,
    Pub. L. No. 107-296, 116 Stat. 2135 (2002) .................................... 16, 21, 35

Implementing Recommendations of the 9/11 Commission Act of 2007,
    Pub. L. No. 110-53, 121 Stat. 266 (2007) ......................................................19

Intelligence Authorization Act for Fiscal Year 2003,
    Pub. L. No. 107-306, 116 Stat. 2383 (2002) .................................................35

Intelligence Reform and Terrorism Prevention Act of 2004,
    Pub. L. No. 108-458, 118 Stat. 3638 (2004) .............................. 18, 24, 29, 36

Security and Accountability for Every Port Act of 2006 (SAFE Port Act),
    Pub. L. No. 109-347, 120 Stat. 1884 (2006) .................................................23

USA PATRIOT Act,
    Pub. L. No. 107-56, 115 Stat. 272 (2001) .....................................................34

**Rules, Rgulations, and Other Authorities**

Fed. R. App. P. 4(a)(2) ........................................................................................1

19 C.F.R. § 161.2 ................................................................................................4

19 C.F.R. § 162.6 ................................................................................................4

49 C.F.R. § 1560.105(b)(1) ................................................................................3

49 C.F.R. § 1560.105(b)(2) ................................................................................3

Homeland Security Presidential Directive-6 (HSPD-6) ................................. 21, 30

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. § 1331. ROA.24. The district court entered final judgment on March 23, 2023. ROA.2883; Record Excerpts (RE) Tab 4 at 1. Plaintiffs filed a premature notice of appeal on March 22, 2023. ROA.2882; RE Tab 2. This Court has jurisdiction under 28 U.S.C. § 1291; *see* Fed. R. App. P. 4(a)(2).

## STATEMENT OF THE ISSUE

Whether Congress has authorized the government to create, maintain, and use the federal terrorist watchlist for screening purposes, including for Transportation Security Administration (TSA) to screen passengers boarding commercial aircraft.

## STATEMENT OF THE CASE

### A.    Statutory and Regulatory Background

#### 1.    The Terrorist Screening Center and Terrorist Screening Dataset.

The Terrorist Screening Dataset (TSDS) is the federal government's consolidated watchlist of known or suspected terrorists, commonly referred to as the "terrorist watchlist." ROA.1600, 2641.[1] The TSDS is maintained by the Terrorist Screening Center (TSC), a multi-agency center administered by the

---

[1] The Terrorist Screening Dataset was formerly known as the Terrorist Screening Database or TSDB.

Federal Bureau of Investigation (FBI). Nominations to the TSDS are made by federal agencies based on credible information from a wide variety of intelligence sources. FBI and TSC work in coordination with the National Counterterrorism Center and the Department of Homeland Security (DHS) and its components, including TSA and U.S. Customs and Border Protection (CBP). TSC is ultimately responsible for determining if the information associated with a nomination meets the established standards for inclusion in the TSDS. The TSDS contains various subset lists (such as the No Fly List and Selectee List, discussed *infra* at 3), which TSC exports to different federal agencies that use that information for various screening and other security functions. *See Ghedi v. Mayorkas*, 16 F.4th 456, 460 (5th Cir. 2021); ROA.2618-23.

## 2. The Transportation Security Administration and Passenger Screening.

The Transportation Security Administration, a component agency of the Department of Homeland Security, is responsible for security in all modes of transportation, including airline travel. 49 U.S.C. § 114(d). The Administrator of TSA is "responsible for day-to-day Federal security screening operations for passenger air transportation," and develops "policies, strategies, and plans for dealing with threats to transportation security." *Id*. § 114(e)(1), (f)(3). TSA shall also "provide for the screening of all passengers and property[] * * * that will be carried aboard a passenger aircraft operated by an air carrier or foreign air carrier

2

in air transportation or intrastate air transportation." *Id*. § 44901(a).  TSA uses

subsets of the TSDS, including the "No Fly List" and the "Selectee List," to screen

airline passengers.  *See* 49 U.S.C. §§ 114(h)(3), 44903(j)(2)(C); *Ghedi*, 16 F.4th at

460.  Individuals on the No Fly List may be prohibited by TSA from boarding a

commercial aircraft.  49 C.F.R. § 1560.105(b)(1).  By contrast, individuals on the

Selectee List are permitted to board a commercial aircraft but must undergo

enhanced security screening before doing so.  *See* 49 C.F.R. § 1560.105(b)(2).  *See*

*Ghedi*, 16 F.4th at 460 (describing enhanced security screening); *Elhady v. Kable*,

993 F.3d 208, 214 (4th Cir. 2021) (same).  TSA may also designate passengers for

enhanced screening by random selection.  *See Ghedi*, 16 F.4th at 460.[2]

### 3.    U.S. Customs and Border Protection and Border Searches.

"Since the founding of our Republic, Congress has granted the Executive

plenary authority to conduct routine searches and seizures at the border."  *United*

*States v. Montoya de Hernandez,* 473 U.S. 531, 537 (1985).  Such "[r]outine

searches of the persons and effects of entrants are not subject to any requirement of

---

[2] The government does not publicly disclose an individual's status on the Selectee List, because "[d]isclosure would disrupt and potentially destroy counterterrorism investigations because terrorists could alter their behavior, avoid detection, and destroy evidence." *Elhady*, 993 F.3d at 215.  By contrast, a U.S. citizen who applies for administrative redress after a denial of boarding may be informed of his or her status on the No Fly List.  *Kashem v. Barr*, 941 F.3d 358, 366 (9th Cir. 2019); *see generally* ROA.1838-39, 1851-52.

reasonable suspicion, probable cause, or warrant." *Id*. at 538. CBP, a component of the Department of Homeland Security, is vested with statutory and regulatory authority to inspect, examine, and search persons, baggage, and merchandise entering or departing from the United States. *See*, *e.g.*, 6 U.S.C. § 211; 19 U.S.C. §§ 482, 1461, 1496; 19 C.F.R. §§ 161.2, 162.6.

CBP uses information from the TSDS in connection with the inspection of international travelers, including the carrying out of border searches of individuals and property, and conducting risk assessments, as well as for other purposes related to border security. ROA.1928-34. Specifically, CBP uses the TECS, its principal law enforcement system, to assist in the process of border searches. TECS maintains information exported from the TSDS. ROA.1928. An alert in TECS that notifies a CBP officer that the traveler is a confirmed or suspected match to an identity in the TSDS or has a prior conviction or offense may indicate that additional scrutiny is warranted. ROA.1930-31. A CBP officer may exercise his or her lawful discretion to refer an individual for additional scrutiny and continuation of the border inspection, sometimes referred to as secondary inspection. Secondary inspections may also occur on a random basis, or for a multitude of other reasons including but not limited to when there is a question about the traveler's documentation, an indication that a traveler has exceeded his or her duty exemptions, or a concern regarding the traveler's merchandise. Once a

traveler is referred for secondary inspection, the specific actions taken vary depending on the officer's evaluation of each traveler's situation. There is no set amount of time that an inspection may take, which depends on many factors, such as the traveler's individual circumstances and the conditions at the port of entry at the time. ROA.1930-32.

## B.    Factual Background

Plaintiffs are five U.S. citizens, ROA.22-23, who allege that they are on the Selectee List, ROA.49 ¶ 190, ROA.52 ¶ 215, ROA.54 ¶ 234, ROA.56 ¶ 247. Plaintiffs assert that, as a result of their asserted status on the Selectee List, they are subject to extra screening at airports and border crossings. *See Kovac v. Wray*, 363 F. Supp.3d 721, 735 (N.D. Tex. 2019); *Kovac v. Wray*, 449 F. Supp.3d 649, 655 (N.D. Tex. 2020).[3]

For example, Plaintiff Aljame alleges that he is "routinely referred to secondary inspection by CBP when he attempts to re-enter the United States," ROA.45 ¶ 153, and "every time [he] travels by air, he is subjected to extensive secondary inspections, prolonged searches and interrogations," ROA.46 ¶ 172, in

---

[3] Plaintiff Adis Kovac was formerly on the No Fly List but was subsequently removed and informed that he would "not be placed back on the No Fly List based on [the] currently available information." *Kovac*, 449 F. Supp.3d at 652. As a result, the district court held that Kovac's claims based on his former No Fly List status were moot, *id.* at 655-56, and Plaintiffs do not contest that holding on appeal. Accordingly, Plaintiffs' arguments on appeal are limited to their alleged status on the Selectee List and do not pertain to the No Fly List.

which he is "searched extensively," "interrogated," and has his luggage and personal belongings searched. ROA.46 ¶¶ 164-166. Plaintiff Sbyti likewise alleges that "every time [he] travels by air, he is referred to secondary inspection and subjected to prolonged searches and questioning." ROA.51 ¶ 212. Plaintiff Allababidi similarly alleges instances in which, upon returning from a trip abroad, he "was escorted for secondary questioning" and CBP officers "interrogated" him and searched his belongings." ROA.52 ¶¶ 219-220. He further alleges that he is "frequently unable to board his flights until he is 'cleared' by DHS to board the flight." ROA.54 ¶ 228. Plaintiff Warsame alleges that she "is unable to check-in and print her boarding passes from a kiosk or online," "is frequently unable to board her flights until she is 'cleared' by DHS to board the flight," and "has been subjected to prolonged searches and interrogations." ROA.55 ¶¶ 236-237.

### C.    Prior Proceedings

Plaintiffs' complaint asserted five causes of action, seeking declaratory and injunctive relief only. ROA.56-67. In a series of orders, the district court dismissed most of Plaintiffs' claims. *See* ROA.458-59 (dismissing all claims against CBP); ROA.466-74 (dismissing substantive and procedural due process claims in part); ROA.478-81(dismissing equal protection claims); ROA.481-84 (dismissing claim under non-delegation doctrine); ROA.1337-38 (dismissing No Fly List claim as moot); ROA.1465-74 (dismissing remaining due process claim).

*See also Kovac*, 363 F. Supp.3d at 749-55, 759-62; *Kovac*, 449 F. Supp.3d at 655; *Kovac v. Wray*, 2020 WL 6545913 at *2-4 (N.D. Tex. 2020). Plaintiffs' appeal does not contest any part of the district court's judgment dismissing these claims.

Only one claim proceeded beyond the pleading stage: Plaintiffs' cause of action under the Administrative Procedure Act, challenging the watchlist and its procedures generally, and alleging that their asserted status on the Selectee List was arbitrary and capricious. The district court granted summary judgment to the government on all aspects of that claim. ROA.2858-2881; RE Tab 3. While the district court did not "confirm[] or deny[]" Plaintiffs' "status on or off the watchlist," it "carefully consider[ed] th[e] classified information" the government had filed *ex parte* (by leave of the court) and "conclude[d] that any challenged Government action was neither arbitrary nor capricious," and that "any agency making such a watchlist nomination did not do so 'solely based on race, ethnicity, national origin, religious affiliation, or First Amendment protected activities,' as [Plaintiffs] allege." ROA.2875 & n.85; RE Tab 3 at 18 & n.85. *See Kovac v. Wray*, --- F. Supp.3d ----, 2023 WL 2430147 at *8 & n.85 (N.D. Tex. 2023). The district court also held that the government's policy of not disclosing a person's watchlist status was not arbitrary or capricious, because "the Government declines to disclose watchlist status for good reason," namely, that "[d]isclosure of that information could provide terrorists with valuable insight into the specific ways in

7

which the Government goes about detecting and preventing terrorist attacks."
ROA.2877; RE Tab 3 at 20. *See Kovac*, 2023 WL 2430147 at *9. Plaintiffs do not
challenge this portion of the district court's judgment in the present appeal.

Finally, the district court granted summary judgment to the government with
respect to Plaintiffs' claim under the Administrative Procedure Act that Congress
did not authorize the government to create, maintain, or use the watchlist.
Although the district court concluded that the major questions doctrine applies,
ROA.2865-68; RE Tab 3 at 8-11, it held that "Congress clearly authorized the
watchlist," ROA.2868; RE Tab 3 at 11, because Congress "authorized the
Government to create and maintain the watchlist," ROA.2869; RE Tab 3 at 12, and
also authorized "TSA's use of the watchlist during airport screening," ROA.2869;
RE Tab 3 at 12.

## SUMMARY OF ARGUMENT

Congress clearly authorized the creation, maintenance, and use of the federal
terrorist watchlist. To begin with, Congress has authorized numerous agencies —
including FBI, DHS, Central Intelligence Agency (CIA), and the National
Counterterrorism Center — to acquire, collect, access, analyze, evaluate, and
classify intelligence relating to criminal, national-security, and/or terrorism-related
matters. Congress likewise authorized the President to ensure that homeland-
security information is shared among and between federal agencies, and with

8

appropriate state and local officials. Congress further provided that DHS should have access to all relevant terrorism-related information including in electronic databases and authorized DHS, in turn, to share that information with its component agencies, including TSA and CBP. Congress then repeatedly refined and reinforced that statutory authorization, which amply includes the authority to create and maintain a federal watchlist.

Congress also authorized the use of the terrorist watchlist in legislation requiring various screening checks that expressly refer to a "terrorist watchlist" or the "terrorist screening database," defined to include the watchlist maintained by the Terrorist Screening Center. Even more specifically, Congress authorized TSA to conduct passenger screening for commercial aviation against the "terrorist watchlist" and against the No Fly and Selectee Lists. Finally, Congress directed DHS, "in consultation with the Terrorist Screening Center," to "design and review" procedures for the "collection, removal and updating of data maintained" in "the no fly and automatic selectee lists."

Contrary to Plaintiffs' contention, in pellucidly clear language Congress authorized the creation, maintenance, and use of the terrorist watchlist, including the creation and maintenance of the terrorist watchlist by the Terrorist Screening Center and its use by TSA in screening passengers.

## STANDARD OF REVIEW

This Court reviews *de novo* the district court's grant of summary judgment. *See*, *e.g.*, *Kariuki v. Tarango*, 709 F.3d 495, 501 (5th Cir. 2013).

## ARGUMENT

## I. PLAINTIFFS' ARGUMENT IS LIMITED TO THE STATUTORY AUTHORITY TO USE THE WATCHLIST FOR TSA'S AIRPORT SCREENING FUNCTION

Before addressing the merits of Plaintiffs' argument, and to emphasize the narrowness of Plaintiffs' argument, it is first important to clarify what issues are *not* properly before this Court or raised in this appeal.

Plaintiffs present a single issue in this appeal pertaining to statutory authority: "[W]hether federal agencies' creation, maintenance, and operation of the federal terror watchlist poses a major question that demands clear congressional authorization and, if so, whether such clear congressional authorization exists." Pls. Br. 3. Although Plaintiffs raised numerous other challenges below, and all of those arguments were rejected by the district court, *see supra* at 6-8, Plaintiffs do not purport to raise those issues in this appeal, nor do they explain why the district court's judgment on these issues was flawed in any respect or develop in their brief any argument for reversal on those grounds.

Having limited their appeal to the sole issue of statutory authority, however, Plaintiffs nonetheless attempt to interject other issues. For example, Plaintiffs

contend in passing that their alleged Selectee List status is unfair because they "have never been charged, arrested, or convicted of a terrorism-related offense," Pls. Br. 12, and they accuse the government of "placing innocent people" on the terrorist watchlist, Pls. Br. at 33. Plaintiffs also object that the watchlist's use of a "reasonable suspicion" standard is, in their view, too lax and thus supposedly "sweeps innocent people onto the list," Pls. Br. 7. But the district court, after carefully reviewing the classified record, rejected on the merits Plaintiffs' argument that their alleged status on the Selectee List is arbitrary and capricious, ROA.2875, and Plaintiffs do not purport to appeal that portion of the judgment or develop any argument in this appeal that would support such a challenge. Thus, any assertion that Plaintiffs' alleged watchlist status is unfair, unsupported, or arbitrary is not properly before this Court and has no bearing on the sole issue of statutory authority that is presented in this appeal.

Similarly, Plaintiffs allege that the administrative redress procedure for seeking relief from the Selectee List is "minimal and leads nowhere." Pls. Br. 11. They object that they "receive no notice" of their placement on the watchlist, "nor do they receive any information" that might support their status. Pls. Br. 7. Again, Plaintiffs made the same argument below — contending that the redress procedures are inconsistent with due process — but the district court dismissed their due process claims, ROA.466-74 (dismissing due process claims in part);

ROA.1465-74 (dismissing remaining due process claims), and also rejected

Plaintiffs' claim that the redress procedures, including the failure to provide notice

of status on the watchlist, were arbitrary, ROA.2877. Plaintiffs do not

meaningfully present any argument in this appeal challenging either of the district

court's conclusions, and hence the adequacy of redress procedures is not properly

before this Court.

Plaintiffs also contend that the watchlist imposes "serious intrusions on

individual liberty," Pls. Br. 30, but the district court rejected that argument as well,

holding that the watchlist did not restrict a cognizable liberty interest under the

Due Process Clause. ROA.467 ("Plaintiffs have failed to state a claim that their

inclusion in the Screening List caused them to suffer a deprivation of a liberty

interested based on their right to travel"); ROA.472 ("Plaintiffs have failed to

allege a violation of their rights to substantive due process based on a

constitutionally protected right to their reputations"); ROA.1473 ("the plaintiffs'

protected liberty interest in nonattainder is uninfringed"); *see also* ROA.474-75.

Again, in this appeal Plaintiffs do not develop or present any argument for why

that portion of the judgment below would be erroneous. Accordingly, Plaintiffs'

assertions that the watchlist deprives them of their individual liberty is not an issue

before this Court and does not play any role in assessing the sole statutory question

presented here.

Plaintiffs also object to many alleged aspects of the watchlist that have no connection to them or the allegations in their complaint. For example, Plaintiffs argue the watchlist affects "nearly every aspect of their lives," Pls. Br. 3, contending that the watchlist "follows them wherever they go," including at "private railroads, colleges, universities, hospitals, and prisons, as well as animal welfare organizations" and can be used to screen them in a variety of settings, including "municipal permit processes, firearm purchases, certain licensing applications, and other scenarios," Pls. Br. 10-11. But Plaintiffs do not allege that any of these putative consequences have happened to them in the past, or that they are likely to occur to them in the future. Likewise, Plaintiffs repeatedly contend that the watchlist "impose[s] adverse immigration consequences," Pls. Br. 1; *see also* Pls. Br. at 11, 24, 29, but all the Plaintiffs are U.S. citizens and cannot (and do not) make any plausible allegation of past or likely future harm to them related to immigration. Rather, the allegations in their complaint relate only to encounters at airports prior to boarding, or attempting to board, a commercial aircraft. Pls. Br. 13-22. And the only injunctive relief Plaintiffs sought in this case related to alleged burdens at the airport and at the border. ROA.67. Accordingly, Plaintiffs

do not have standing to object to these alleged other consequences.  *Elhady*, 993

F.3d at 227-28; *Abdi v. Wray,* 942 F.3d 1019, 1033-34 (10th Cir. 2019).[4]

## II.  CONGRESS CLEARLY AUTHORIZED THE CREATION, MAINTENANCE, AND USE OF THE WATCHLIST

Contrary to Plaintiffs' claim, Congress clearly authorized the creation,

maintenance, and use of a terrorist watchlist, including its creation and

maintenance by TSC and its use by TSA to screen passengers.  Indeed, Congress

has expressly authorized every step in the process — from authorizing the

investigation of terrorist-related matters and the collection and analysis of related

intelligence; to the creation of an information-sharing apparatus to disseminate

information within the federal government and to appropriate state and local

officials; to the authorization of various types of screening against the watchlist

maintained by the Terrorist Screening Center; to specifically requiring TSA to use

the TSC's watchlist, including the No Fly and Selectee Lists, to screen passengers

and take appropriate action.  And, finally, Congress expressly and unequivocally

directed DHS to design and review policies and operating procedures for the

_____

[4] Even with respect to encounters at the airport, many of Plaintiffs' allegations relate specifically to *international* flights, *see* Pls. Br. 13-22, and their complaint is replete with references to alleged actions by CBP officers taken in connection with such border crossings, *see, e.g.,* ROA.45 ¶ 153, ROA.46 ¶¶ 164-166, ROA.48 ¶¶ 182-183, ROA.49-50 ¶¶ 193-195, ROA.52-53 ¶¶ 220-224; *see also* Pls. Br. 18.  Yet the district court dismissed all claims against CBP, ROA.458-459, and Plaintiffs do not appeal from that portion of the judgment.  Accordingly, these allegations should have no bearing on the issue presented in this appeal.

collection, removal, and updating of data maintained in the No Fly and Selectee

subsets of the watchlist, and to do so in consultation with the Terrorist Screening

Center.

Plaintiffs' assertion that the government lacks the necessary statutory

authority is meritless. Plaintiffs cannot and do not cite a single authority accepting

their argument, and every court to address the issue has rejected their contention.

*See Salloum v. Kable*, 2020 WL 7480549 at *21 (E.D. Mich. 2020) (rejecting

argument that "Congress has not authorized the Executive Branch to utilize the

federal terror watch list"); *El Ali v. Barr*, 473 F. Supp.3d 479, 529 (D. Md. 2020)

(similar); *Elhady v. Piehota*, 303 F. Supp.3d 453, 467 (E.D. Va. 2017) (rejecting

argument "that TSA and TSC exceeded their authority by creating the Watch

List"), *rev'd on other grounds Elhady v. Kable*, 993 F.3d 208 (4th Cir. 2021);

*Mohamed v. Holder*, 266 F. Supp.3d 868, 883-84 (E.D. Va. 2017) (rejecting

argument "that TSC and TSA have exceeded their authority"). *Cf. Ibrahim v.

DHS*, 669 F.3d 983, 988-89 (9th Cir. 2012) (noting that "the federal government

has assembled a vast, multi-agency, counterterrorism bureaucracy" and citing

relevant statutory authority).

A.    Statutory Authorization to Investigate, Collect and Analyze
      Terrorist-Related Intelligence

To begin with, Congress authorized various executive branch agencies to

acquire, collect, access, analyze, evaluate, and classify intelligence relating to

criminal, national security, and/or terrorism-related matters. *See, e.g.,* 28 U.S.C.
§ 533 (FBI to "conduct such other investigations * * * as may be directed by the
Attorney General"); *id.* § 534(a)(1), (4) (FBI to "acquire, collect, classify, and
preserve identification, criminal identification, crime, and other records" and
"exchange such records and information with, and for the official use of,
authorized officials of the Federal Government"); *id.* § 538 (FBI "shall investigate
any violation" of air piracy or related statutes); 6 U.S.C. § 121(d)(1) (DHS Office
of Intelligence and Analysis shall "access, receive, and analyze law enforcement
information, intelligence information, and other information from agencies of the
Federal Government [and] integrate such information * * * in order to * * *
identify and assess the nature and scope of terrorist threats to the homeland"); *id.*
§ 121(d)(12) (discussing "information databases and analytical tools developed or
utilized" by DHS Office of Intelligence and Analysis); 50 U.S.C. § 3056(d)(1)
(National Counterterrorism Center shall "serve as the primary organization in the
United States Government for analyzing and integrating all intelligence possessed
or acquired by the United States Government pertaining to terrorism and
counterterrorism"); 50 U.S.C. § 3036(d) (CIA shall "collect intelligence through
human sources and by other appropriate means" and "correlate and evaluate
intelligence related to the national security and provide appropriate dissemination
of such intelligence"). Plaintiffs do not dispute this point. *See* Pls. Br. 35.

B.    Statutory Requirements to Share Intelligence Among Federal
      Agencies and with Appropriate State and Local Officials

In the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135

(2002), Congress broadly authorized — indeed, required — federal agencies to

share terrorist-related information with each other, and with appropriate state and

local personnel, and ensured that the Secretary of Homeland Security would have

access to all information relating to terrorist threats.  Specifically, Congress

directed that:

> The President shall prescribe and implement procedures under which
> relevant Federal agencies * * * share relevant and appropriate
> homeland security information with other Federal agencies, including
> the Department [of Homeland Security], and appropriate State and
> local personnel [and] all appropriate agencies, including the
> intelligence community, shall, through information sharing systems,
> share homeland security information with Federal agencies and
> appropriate State and local personnel.

6 U.S.C. § 482(a)(1)(A), (b)(1).  The same statute defines "homeland security

information" to include "any information possessed by a Federal, State, or local

agency that * * * relates to the threat of terrorist activity."  6 U.S.C. § 482(f)(1).

Similarly, Congress directed that

> the Secretary [of Homeland Security] shall have such access as the
> Secretary considers necessary to all information, including reports,
> assessments, analyses, and unevaluated intelligence relating to threats
> of terrorism against the United States [and] the Secretary may obtain
> such material upon request, and may enter into cooperative
> arrangements with other executive agencies to provide such material
> or provide Department officials with access to it on a regular or

routine basis, *including requests or arrangements involving broad categories of material, access to electronic databases*, or both.

6 U.S.C. § 122(a)(1), (b)(1) (emphasis added).  Congress further provided that

"[t]he Secretary [of Homeland Security] * * * shall work to ensure that intelligence

or other information relating to terrorism to which the Department has access is

appropriately shared with * * * elements of the Federal Government * * * as well

as with State and local governments, as appropriate."  *Id.* § 122(d)(2).

    In the Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L.

No. 108-458, 118 Stat. 3638 (2004), Congress further specified and authorized the

sharing of terrorist-related information within the federal government and with

state and local officials.  Congress directed the formation of an "information

sharing environment," defined to mean "an approach that facilitates the sharing of

terrorism and homeland security information, which may include any method

determined [to be] necessary and appropriate" by the President.  6 U.S.C.

§ 485(a)(3).  In the same statute, Congress directed that

> The President shall * * * create an information sharing environment for the sharing of terrorism information in a manner consistent with national security [and] * * * determine and enforce the policies, directives, and rules that will govern the content and usage of the [information sharing environment].

6 U.S.C. § 485(b)(1)(A), (C).  Congress further specified that

> The President shall * * * ensure that the [information sharing environment] provides and facilitates the means for sharing terrorism information among all appropriate Federal, State, local, and tribal

entities, and the private sector through the use of policy guidelines and technologies [and] ensure that the [information sharing environment] provides the functional equivalent of, or otherwise supports, a decentralized, distributed, and coordinated environment that * * * facilitates the availability of information in a form and manner that facilitates its use in analysis, investigations and operations [and] * * * integrates technologies, including all legacy technologies, through internet-based services * * * to enable connectivity among required users at the Federal, State, and local levels.

6 U.S.C. § 485(b)(2)(C), (K).

In the same Act, Congress directed the Department of Homeland Security to appropriately share intelligence with its component agencies, including CBP and TSA, as well as other federal agencies:

[T]he Secretary of Homeland Security [shall] * * * ensur[e] effective coordination, with respect to * * * dissemination of intelligence and information related to terrorist travel * * * among appropriate subdivisions of the Department of Homeland Security * * * including [the] United States Customs and Border Protection [and] the Transportation Security Administration; and [also] between the Department of Homeland Security and other appropriate Federal agencies.

6 U.S.C. § 123(c)(4)(A).

In the Implementing Recommendations of the 9/11 Commission Act of 2007, Pub. L. No. 110-53, 121 Stat. 266 (2007), Congress further directed the Secretary of Homeland Security to administer the Homeland Security Advisory System "to provide advisories or warnings regarding the threat or risk that acts of terrorism will be committed on the homeland to Federal, State, local, and tribal government authorities," and to "provide * * * specific information and advice

regarding appropriate protective measures and countermeasures that may be taken in response to the threat or risk." 6 U.S.C. § 124(a), (b)(3). Congress further instructed the Secretary to "integrate the information and standardize the format of the products of the intelligence components of the Department containing homeland security information [or] terrorism information" and to "integrate such information into the information gathered by the Department and other departments and agencies of the Federal Government." 6 U.S.C. § 124a(a), (c)(1)(B). The Secretary was required to establish "a comprehensive information technology network architecture * * * that connects the various databases and related information technology assets of the Office of Intelligence and Analysis and the intelligence components of the Department in order to promote internal information sharing among the intelligence and other personnel of the Department." 6 U.S.C. § 124b(a).[5]

---

[5] *See also* 6 U.S.C. § 126(a)(1)-(2) (requiring Secretary to "develop a data framework to integrate existing Department of Homeland Security datasets and systems, as appropriate, for access by authorized personnel," including "[a]ll information acquired, held, or obtained [by DHS] including homeland security information [and] terrorism information."); 49 U.S.C. § 114(t)(1)-(3) (requiring Secretary to establish a "Transportation Security Information Sharing Plan" that "promote[s] sharing of transportation security information," including "information relating to the risks to transportation modes," "between [DHS] and public and private stakeholders" including "Federal, State, and local agencies, tribal governments, and appropriate private entities").

The above statutory authorities provide clear and ample congressional authorization to create, maintain, operate, and share within the federal government (and with appropriate state and local officials) a federal terrorist watchlist such as the Terrorist Screening Dataset and its subsets. Indeed, the President's statutory authority to "prescribe and implement procedures under which relevant Federal agencies * * * share relevant and appropriate homeland security information with other Federal agencies," 6 U.S.C. § 482(a)(1)(A), was enacted in 2002, *see* Pub. L. No. 107-296 § 892, 116 Stat. at 2253, and clearly authorized the President (in 2003) to promulgate Homeland Security Presidential Directive-6 (HSPD-6), *see* ROA.2647-53. And as Plaintiffs concede (Pls. Br. 3-4), HSPD-6 led directly to the creation of the Terrorist Screening Center and its maintenance of the Terrorist Screening Dataset.

It is true, as Plaintiffs repeatedly argue, that none of the above statutes "mentioned a watchlist." Pls. Br. 37; *see* Pls. Br. 38 (arguing that not "a single statute even mentions * * * a watchlist"), Pls. Br. at 41 (contending statutory language "nowhere makes any mention of a watchlist"). But Congress is not required to use the specific word "watchlist" or the particular phrase "Terrorist Screening Dataset" in order to authorize the creation, maintenance, and sharing of that kind of terrorism-related information. The above statutory authorities confer that authority in clear and unmistakable fashion.

C.    <u>Statutes Authorizing or Requiring Screening Against the</u>
      <u>Watchlist</u>

Even if using the specific word "watchlist" were required, as Plaintiffs

contend, Congress did so by authorizing, or requiring, various federal agencies to

conduct screening against the terrorist watchlist.  For example, Congress required

the Secretary of Homeland Security to "complete a name-based security

background check against the consolidated terrorist watchlist" for all public

transportation frontline employees, 6 U.S.C. § 1140, and to conduct "a background

check of the individual and a review of the consolidated terrorist watchlist" for all

non-citizen individuals "serving as the security coordinator" for over-the-road bus

operators, 6 U.S.C. § 1181(e)(2).  *See* 6 U.S.C. § 1162(e)(2) (same for railroad

carriers).

Similarly, Congress instructed that the Federal Air Marshal Service may

provide training to foreign law enforcement personnel only "after comparing the

identifying information and records * * * against all appropriate records in the

consolidated and integrated terrorist watchlists maintained by the Federal

Government."  49 U.S.C. § 44917(c)(2).  Congress also required that, for

individuals granted unescorted access to the secure area of an airport or the air

operations area of an airport, such individuals must be screened by the

Administrator of TSA "against all appropriate records in the consolidated and

integrated terrorist watchlist maintained by the Federal Government." 49 U.S.C. § 44903(j)(2)(D).

Congress further directed that the TSA Administrator shall assess any vulnerabilities in the TSA PreCheck Program vetting process and whether further measures should be taken in addition to the existing "recurrent checks against the terrorist watchlist." 49 U.S.C. § 44919(j). Finally, Congress required the Secretary to prescribe regulations for the issuance of a "transportation worker identification credential" to individuals who enter a secure area of a vessel or facility, and which would require a "background records check" for such individuals. 46 U.S.C. § 70105(a), (d). In the Security and Accountability for Every Port Act of 2006 (SAFE Port Act), Pub. L. No. 109-347 §104(c), 120 Stat. 1884, 1891 (2006), Congress further specified that such a background check "shall include a check against the consolidated and integrated terrorist watchlist maintained by the Federal Government."

Congress not only expressly required screening against the "terrorist watchlist," but also expressly named the "terrorist screening database" (as the Terrorist Screening Dataset was formerly called, *see supra* note 1). For example, Congress authorized, in certain situations, a covered chemical facility to "vet[] individuals against the terrorist screening database." 6 U.S.C. § 622(d)(2)(B)(i)(I); *see also* 6 U.S.C. § 622(d)(2)(A)(ii). Moreover, that statute defines "terrorist

screening database" to mean "the terrorist screening database maintained by the Federal Government Terrorist Screening Center or its successor." 6 U.S.C. § 621(10) (emphasis added). In a similar fashion, Congress required the Secretary of Homeland Security to conduct checks "against identifying information that appears in the terrorist screening database" for a person seeking to register as an owner or purchaser of ammonium nitrate or an ammonium nitrate facility. 6 U.S.C. § 488a(*i*)(2)(A).

Congress also authorized screening with specific reference to the "Terrorist Screening Center," which is the agency that maintains the Terrorist Screening Dataset. For instance, Congress authorized the Secretary of Homeland Security to make grants to railroad carriers for, among other things, "[t]he sharing of intelligence and information about security threats and preparedness, *including connectivity to the National Terrorist Screening Center*." 6 U.S.C. § 1163(b)(7) (emphasis added). The Secretary is also authorized to make grants to Amtrak to "connect to the *National Terrorism Screening Center watchlist*." 6 U.S.C. § 1164(a)(3)(D) (emphasis added). *See also id.* § 621(10) (defining "terrorist screening database" as the database maintained by the "Terrorist Screening Center").[6]

_____

[6] *See also* Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. No. 108-458 § 4012(c), 118 Stat. 3638, 3718 (2004) (requiring Director of

*Continued on next page.*

D.   Statutes Authorizing or Requiring TSA to Screen Passengers Against the Watchlist

Congress also expressly required and authorized TSA to conduct security screening using the "terrorist watchlist" (or, more generally, "Federal agency databases") and, in addition, Congress specifically required screening against the watchlist subsets the "no fly list" and the "selectee list."

Congress authorized the TSA Administrator to

enter into memoranda of understanding with Federal agencies or other entities to share or otherwise *cross-check as necessary data on individuals identified on Federal agency databases* who may pose a risk to transportation or national security; * * * establish procedures *for identi[fying] individuals known to pose, or suspected of posing, a risk of air piracy or terrorism* or a threat to airline or passenger safety; [and] in consultation with other appropriate Federal agencies [to] establish policies and procedures requiring air carriers to use information from government agencies to identify individuals on passenger lists who may be a threat to civil aviation or national security; and * * * if such an individual is identified * * * *prevent the individual from boarding an aircraft, or take other appropriate action with respect to that individual.*

49 U.S.C. § 114(h)(1)-(3) (emphases added).

Congress also authorized or required air carriers, including foreign air carriers, to provide passenger flight manifests, 49 U.S.C. § 44909(a)-(b), which are

---

National Intelligence to submit to Congress a report on "the Terrorist Screening Center consolidated screening watchlist").

in turn provided to CBP, *id.* § 44909(c)(1),[7] and used by DHS "to compare

passenger information for any international flight to or from the United States

*against the consolidated and integrated terrorist watchlist* maintained by the

Federal Government before departure of the flight," *id.* § 44909(c)(6)(A)

(emphasis added).

Congress required the TSA Administrator to commence testing of, and then

to begin assuming the performance of, a

> passenger prescreening system that will allow the Department of
> Homeland Security to assume the performance of comparing
> passenger information * * * to the automatic *selectee and no fly lists*,
> utilizing all appropriate records in the *consolidated and integrated
> terrorist watchlist* maintained by the Federal Government.

49 U.S.C. § 44903(j)(2)(C)(i), (ii) (emphasis added).

Congress similarly required TSA to establish a process for certain operators

or lessors of charter air transportation

> to use the advanced passenger prescreening system to compare
> information about any individual seeking to charter an aircraft * * * to
> the automatic *selectee and no fly lists*, utilizing all appropriate records
> in the *consolidated and integrated terrorist watchlist* maintained by
> the Federal Government.

---

[7] CBP is also authorized "to collect and analyze traveler and cargo
information in advance of arrival in the United States to identify and address
security risks and strengthen trade enforcement," including "coorindat[ion] with
the Transportation Security Administration, as appropriate." 6 U.S.C.
§ 211(g)(4)(C)(i), (v). *See also* 19 U.S.C. § 1431.

49 U.S.C. § 44903(j)(2)(E)(i)(I) (emphases added).

If there were any remaining doubt, Congress also expressly authorized DHS

not only to use the No Fly and Selectee Lists to screen passengers, but also to

design, operate and maintain those lists and to do so in partnership with the

Terrorist Screening Center:

> The Secretary of Homeland Security, *in consultation with the
> Terrorist Screening Center*, shall *design and review*, as necessary,
> guidelines, policies, and operating procedures for the *collection,
> removal, and updating of data* maintained, or to be maintained, *in the
> no fly and automatic selectee lists*.

49 U.S.C. § 44903(j)(2)(E)(iii) (emphases added).

E.     Plaintiffs' Contrary Arguments Are Meritless

Plaintiffs scarcely discuss any of the above statutory authorities, and to the

extent they do, their contentions are meritless.

Plaintiffs concede that, in their view, 49 U.S.C. § 114(h), *see* supra at 25,

"comes the closest to providing clear congressional authorization for any watchlist-

related activity." Pls. Br. 40. Plaintiffs brush this authority aside because it

"nowhere makes any mention of a watchlist." Pls. Br. at 41. Contrary to

Plaintiffs' assertion, however, there is no requirement that Congress use the

particular word "watchlist," rather than "data * * * on Federal agency databases"

concerning individuals who "pose, or [are] suspected of posing, a risk of * * *

terrorism." 49 U.S.C. § 114(h)(1), (2). And if there were any such requirement,

Congress has employed the term "watchlist" in multiple statutory provisions. *See supra* 21-24.

Plaintiffs also assert (Pls. Br. 41) that Section 114(h) does not authorize TSA to use the terrorist watchlist for air passenger screening, but the statute self-evidently does exactly that: it authorizes TSA to "cross-check * * * data on individuals identified on Federal agency databases who may pose a risk to transportation" and "if such an individual is identified * * * prevent the individual from boarding * * * or take other appropriate action." 49 U.S.C. § 114(h)(1), (3).

Finally, Plaintiffs find Section 114(h) deficient because it does not mention any federal agencies other than TSA. Pls. Br. 41. But the statute directs TSA to enter into memoranda of understanding "with Federal agencies" and to "share or otherwise cross-check as necessary data * * *on Federal agency databases," as well as to conduct screening "in consultation with other appropriate Federal agencies." 49 U.S.C. § 114(h)(1), (3). Congress clearly understood that TSA would conduct passenger screening in coordination with other federal agencies besides TSA itself.

Plaintiffs nonetheless insist that Section 114(h) at most authorizes TSA to *use* the terrorist watchlist for passenger screening, but in their view that does not mean Congress authorized "TSC to create, maintain, and administer the watchlist in the first place." Pls. Br. 42. That argument is mistaken for multiple reasons. First, the argument is premised on the view that Congress authorized TSA to use a

watchlist that Congress did not authorize to be created in the first place. That premise would render Section 114(h) a nullity because it would nonsensically require TSA to conduct screening against a list that (in Plaintiffs' view) had not been lawfully created. It would likewise render a nullity all the other statutes in which Congress authorized various agencies other than TSA to conduct screening against the watchlist for various purposes, including those that expressly identify the Terrorist Screening Database and/or the Terrorist Screening Center. *See supra* at 21-24. Finally, even if Plaintiffs were correct that Section 114(h) only authorizes TSA's *use* of the watchlist for screening, Congress elsewhere authorized DHS "*in consultation with the Terrorist Screening Center*" to "design and review" "procedures for the collection, removal, and updating of data * * * in the no fly and automatic selectee lists." 49 U.S.C. § 44903(j)(2)(E)(iii) (emphasis added). Contrary to Plaintiffs' contention, congressional authorization could hardly have been clearer for "TSC [in consultation with DHS] to create, maintain, and administer the watchlist." Pls. Br. 42.

Faced with that unambiguous statutory authority, Plaintiffs object that Section 44903 represents "Congress's after-the-fact acquiescence," which, in Plaintiff's view, "cannot provide the clear congressional authorization for the agency's action" because "Congress's clear authorization must come before the agency asserts [its] power." Pls. Br. 43. That argument is factually and legally

mistaken.  It is factually mistaken because the relevant portions of Section 44903 were enacted in 2004, *see* Pub. L. No. 108-458 § 4012(a)(1), 118 Stat. at 3715-17, long before all of Plaintiffs' various allegations in this case, *see* Pls. Br. 12-22.  It is legally mistaken because "[i]t is well settled that Congress may, by enactment not otherwise inappropriate, ratify acts which it might have authorized, and give the force of law to official action unauthorized when taken. * * * The mere fact that the validation is retroactive in its operation is not enough * * * to render it ineffective."  *Swayne & Hoyt v. United States*, 300 U.S. 297, 301-02 (1937) (alteration omitted).  *Cf. AMG Capital Mgmt. v. FTC*, 141 S. Ct. 1341, 1351 (2021) ("We have held that Congress' acquiescence to a settled judicial interpretation can suggest adoption of that interpretation.").  Contrary to Plaintiffs' assertion, Pls. Br. 44, the major questions doctrine does not demand a different result.  For example, in *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 155-56 (2000) — the progenitor of the contemporary "major questions" doctrine — the Supreme Court held that Congress could (and, in that case, did) validly enact legislation to effectively ratify an executive agency's previous, longstanding, and consistent position regarding its statutory authority.[8]

---

[8] As Plaintiffs note, the Terrorist Screening Center and the Terrorist Screening Dataset were first created by order of the President in Homeland Security Presidential Directive 6.  *See* Pls. Br. 3-4.  As noted above, HSPD-6 was authorized by existing legislation.  *See supra* at 20-21.  But even assuming

*Continued on next page.*

## III. THE MAJOR QUESTIONS DOCTRINE DOES NOT APPLY

When the major questions doctrine applies, courts require "clear congressional authorization" for the statutory authority an agency claims. *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022). As the district court correctly held, however, even if the major questions doctrine applies, Congress "clearly authorized the Government to create and maintain the watchlist," and "Congress clearly authorized the TSA's use of the watchlist during airport screening." ROA.2869. Accordingly, this Court need not decide whether the major questions doctrine applies in this case, because the statutory provisions described in detail above more than meet any requirement for clear authorization.

Should this Court reach the issue, the major questions doctrine does not apply in this case. As the district court explained, most of the factors indicative of a major question are absent here: the statutory provisions authorizing the creation, maintenance, and use of the watchlist are not written in a "cryptic * * * fashion," *West Virginia*, 142 S. Ct. at 2608; the agencies that create, maintain, and use the

---

Plaintiffs were correct that no legislation authorized the President's directive, that conclusion would only prompt the subsequent question of whether the President has independent authority to take such action, in the absence of any statute purporting to deny that authority. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring in the judgment and opinion of the Court); *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 10 (2015). Because Congress's authorization is clear, this Court need not address that question in this case.

watchlist have "comparative expertise in making" the relevant "policy judgments," *id.* at 2612-13; the watchlist confers no "power over the national economy" or anything close to it, *id.* at 2609; and the government is not claiming a new authority derived from "a long-extant statute" that "had rarely been used in the preceding decades," *id.* at 2610; *see National Fed'n of Indep. Bus. v. Dep't of Labor*, 142 S. Ct. 661, 666 (2022) (per curiam) ("lack of historical precedent * * * is a telling indication that the mandate extends beyond the agency's legitimate reach"). *See* ROA.2868-74.

Plaintiffs' principal argument for applying the major questions doctrine is that TSA's use of the watchlist to screen airport passengers is an "extraordinary, far-reaching authority" that "impose[s] serious intrusions on individual liberty." Pls. Br. 27, 30. That is incorrect.

Even without the watchlist or its subset the Selectee List, TSA is authorized by Congress to conduct the screening of all passengers and property, including carry-on and checked baggage. *See* 49 U.S.C. § 44901(a); 49 U.S.C. § 114(e). And as this Court and others have long recognized, and consistent with the Fourth Amendment, the government may conduct such airport screening, including pat-downs and other security screening measures, even without any individualized suspicion. *See*, *e.g.*, *United States v. Skipwith*, 482 F.2d 1272, 1275-77 (5th Cir. 1973); *United States v. Clay*, 638 F.2d 889, 891-92 (5th Cir. 1981); *Corbett v. TSA*,

767 F.3d 1171, 1179-82 (11th Cir. 2014); *see also Electronic Privacy Info. Ctr. v. DHS*, 653 F.3d 1, 10-11 (D.C. Cir. 2011) (collecting cases). Moreover, even without the watchlist or the Selectee List, all passengers may be randomly selected for the same enhanced security screening applicable to those on the watchlist. *Ghedi*, 16 F.4th at 460. It is for these reasons that this Court has held the extra security measures of enhanced security screening, even if allegedly conducted due to status on the Selectee List, do not implicate a protected liberty interest under the Due Process Clause, *id.* at 466-67, a view that is in accord with every other circuit to have addressed the question, *see Elhady*, 993 F.3d at 220-23; *Abdi*, 942 F.3d at 1030-31; *Beydoun v. Sessions*, 871 F.3d 459, 467-68 (6th Cir. 2017).[9]

It is not disputed or challenged in this case that TSA has independent authority to search all passengers and their property before boarding even without any individualized suspicion. Nor is it disputed or challenged in this case that TSA may randomly select travelers for enhanced security screening for reasons that have nothing to do with the Selectee List. These authorities will continue regardless of the outcome of this case. Accordingly, the *additional* TSA authority to conduct enhanced security screening pursuant to the federal government's

---

[9] Likewise, regardless of the watchlist, CBP is authorized to screen and search all individuals (and their property), regardless of citizenship, when they arrive at the border. *See* 19 U.S.C. §§ 482(a), 1431, 1461, 1496. Such routine searches may be conducted consistent with the Fourth Amendment even without any showing of individualized suspicion. *See supra* at 3.

watchlist of known or suspected terrorists hardly represents "an enormous and transformative expansion" of the government's previous and unchallenged statutory authority to conduct airport screening. *Utility Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014). *Cf. Biden v. Missouri*, 142 S. Ct. 647, 652-53 (2022) (per curiam) (concluding that Centers for Medicare and Medicaid Service's vaccine requirement was within its statutory authority in light of the longstanding and routine conditions that agency had previously enforced).

Plaintiffs contend that "[t]he effects of watchlisting do not end outside an airport's doors." Pls. Br. 10. But as noted above, *supra* at 5-6, Plaintiffs' allegations in this case relate only to encounters at airports prior to boarding, or attempting to board, a commercial aircraft, Pls. Br. 13-22, and the only injunctive relief they seek pertains to asserted burdens at the airport and at the border, ROA.67. Accordingly, they lack standing to challenge any other purported consequence of the watchlist. Similarly, Plaintiffs contend that the watchlist is a serious intrusion because TSA may use it "to deny some individuals boarding." Pls. Br. 28. But as also previously noted, *supra* note 3, there is no longer any claim in this case that any Plaintiff is on the No Fly List. And because no Plaintiff is on the No Fly List, the district court correctly held that it would not consider the consequences of the No Fly List in determining whether the major questions doctrine applied. ROA.2868 n.47.

Plaintiffs and the district court are no doubt correct that mitigating potential

terrorist threats to air transportation is an issue of "political significance." But that

political significance does not "provide a reason to hesitate before concluding that

Congress meant to confer" the authority to create, maintain, and use the watchlist.

*West Virginia*, 142 S. Ct. at 2608.

Within months of the terrorist attacks of September 11, 2001, Congress

created the Transportation Security Administration, whose functions included

"civil aviation security" and "day-to-day Federal security screening operations for

passenger air transportation." 49 U.S.C. § 114(d)(1), (e)(1). *See* Aviation and

Transportation Security Act, Pub. L. No. 107-71 § 101, 115 Stat. 597, 597 (2001).

Congress also promptly enacted the USA PATRIOT Act, Pub. L. No. 107-56, 115

Stat. 272 (2001), which, among other things, authorized enhanced surveillance

procedures, *id.*, Title II, §§ 201-225, 115 Stat. at 278-96. The following year,

Congress created the Department of Homeland Security, whose primary mission is

to "prevent terrorist attacks within the United States," 6 U.S.C. § 111(b)(1)(A),

and, among other things, transferred TSA's functions to the Department, *id.*

§ 203(2). *See* Homeland Security Act of 2002, Pub. L. No. 107-296, Title IV

§ 403, 116 Stat. 2135, 2178 (2002). Congress also established the National

Commission on Terrorist Attacks Upon the United States, commonly referred to as

the 9/11 Commission, to "examine and report upon the facts and causes relating to

the terrorist attacks of September 11, 2001" and, among other things, make "recommendations for corrective measures that can be taken to prevent acts of terrorism." *See* Intelligence Authorization Act for Fiscal Year 2003, Pub. L. No. 107-306, Title VI § 602, 116 Stat. 2383, 2408 (2002).[10] Congress subsequently created a new position of Director of National Intelligence to provide, among other things, "objectives, priorities, and guidance for the intelligence community to ensure timely and effective collection, processing, analysis, and dissemination * * * of national intelligence." 50 U.S.C. § 3024(f)(1)(A). Congress also created the National Counterterrorism Center "[t]o serve as the primary organization in the United States Government for analyzing and integrating all intelligence possessed or acquired by the United States Government pertaining to terrorism and counterterrorism," 50 U.S.C. § 3056(d)(1). *See* Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. No. 108-458, Title I §§ 1011, 1021, 118 Stat. 3638, 3643-62, 3672-75 (2004).

In these and other transformative federal statutes, Congress remade the Nation's approach to combatting terrorism, and in particular the government's approach to securing civil aviation against terrorist attacks. It is not at all

---

[10] The 9/11 Commission recommended to Congress the "[i]mproved use of 'no-fly' and 'automatic selectee' lists" that should "utilize the large set of watchlists maintained by the federal government." 9/11 Commission Report 393 (2004).

surprising, therefore, that Congress would have included among its legislation the authorization to create, maintain, and use the federal terrorist watchlist for screening purposes, including for civil aviation security.  Indeed, it would have been surprising if Congress had *not* done so.  While the creation, maintenance, and use of the terrorist watchlist was politically significant, that significance provides no reason to hesitate before concluding that Congress conferred such authority by statute.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney
General*

LEIGHA SIMONTON
*United States Attorney*

SHARON SWINGLE

*/s/ Joshua Waldman*
JOSHUA WALDMAN
*Attorneys, Appellate Staff
Civil Division, Room 7527
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
(202) 514-0236*

August 2023

## CERTIFICATE OF SERVICE

I hereby certify that on August 21, 2023, I electronically filed the foregoing

brief with the Clerk of the Court for the United States Court of Appeals for the

Fifth Circuit by using the appellate CM/ECF system.  Service will be accomplished

by the appellate CM/ECF system.


 *s/ Joshua Waldman*
Counsel for Appellees

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 8,485 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in Times New Roman 14-point font, a proportionally spaced typeface.

_s/ Joshua Waldman_
Counsel for Appellees